UNITED STATES of America ex rel. R.C. TAYLOR III, Plaintiffs,

v.

Mario **GABELLI,** Lynch Corp., Lynch Interactive Corp., Lynch PCS Communications Corp., Lynch PCS Corporation A, Lynch PCS Corporation B, Lynch PCS Corporation C, Lynch PCS Corporation D, Lynch PCS Corporation E, Lynch PCS Corporation F, Lynch PCS Corporation H, Lynch Paging Corp., Fortunet Wireless Communications Corp., Aer Force Communications, Inc., Aer Force Communications LP, New England Wireless Communications, LP, New

---

314

England Wireless Communications, Corp., Southeast Wireless Communications, LP, Southeast Wireless Communications Corp., Fortunet Wireless Communications, LP, Fortunet Communications LP, High Country Communications, LP, High Country Communications Corp., Aer Force Communications B, LP, Aer Force Communications II, LP, Rivgam Communicators, Inc., Gamco Investors, Inc., Gabelli Funds, Inc., BAL/Rivgam LLC, Rivgam Communicators, LLC, Gabelli Group Capital Partners, Inc., ARF Communications B, Inc., East/West Communications Inc., ABC–LMDS LLC, BCDJMS LLC, BCK/Rivgam LLC, Rivgam LMDS LLC, Beta Communications LLC, Theta Communications LLC, Theta Communications I, LLC, Theta Communications II, LLC, Theta Communications IA LLC, PTPMS Communications LLC, Ptmps II Communications LLC, Betapage Communications LLC, Sunshine PCS Corp., Alfred Angelo, Karen Johnson, Victoria Kane, James Balitsos, Marie Balitsos, T. Gibbs Kane, Nara Cadorin, Clarence Davis, Kathleen Sugarman, Gary Sugarman, Katherine Stafford, Trent Tucker, Keith Mantle, Kuni Nakamura, Jennifer Caiati, Nancy Vanneck, and Thomas Wilson, Defendants.

No. 03 Civ.8762(SAS).

United States District Court,
S.D. New York.

July 29, 2004.

Brendan V. Sullivan, Jr., Christopher Nicholas Manning, Manish K. Mital, Paul B. Gaffney, Williams & Connolly LLP, Washington, DC, Erika Kelton, Phillips & Cohen, Washington, DC, Marc Marmaro, Jeffer, Mangels, Butler & Marmaro, Los Angeles, CA, Richard J. Dircks, Getnick & Getnick, New York, NY, for Plaintiff–Relator.

Robert I. Bodian, Seth R. Goldman, Mintz Levin Cohn Ferris Glovsky and Popeo, PC, New York, NY, R. Robert Popeo, Mintz Levin Cohn Ferris Glovsky and Popeo, PC, Boston, MA, for Defendant Mario Gabelli.

Ethan M. Posner, Sarah L. Wilson, Christopher M. Denig, Michael C. Boteler, Covington & Burling, Washington, DC, for Defendants Other than Gabelli.

## OPINION AND ORDER

SCHEINDLIN, District Judge.

R.C. Taylor brings this qui tam action pursuant to the federal False Claims Act ("FCA" or the "Act"),[1] alleging a conspiracy to defraud the United States (the "Government") through abuse of the Federal Communication Commission's ("FCC") public bidding procedure for wireless telecommunications licenses.[2] Defendants are accused of participating in a scheme whereby numerous "sham entities [ ] held themselves out as legitimate 'small' telecommunications businesses," but were actually "fronts for [ ] Gabelli and Gabelli-related entities, and vehicles for them to acquire valuable spectrum licenses at substantial federal discounts."[3] Various corporate and individual defendants[4] now

---

1. 31 U.S.C. § 3729 *et seq.* Taylor, an attorney specializing in federal administrative and telecommunications law, *see* First Amended Complaint ("Compl.") ¶ 14, originally filed this action on February 14, 2001 in the District of Columbia. On October 25, 2001, the Department of Justice preliminarily elected not to intervene and approximately two years later, the case was transferred to this district.

2. The Complaint alleges three FCA claims, brought pursuant to 31 *U.S.C.* § 3729(a)(1)-(2), (3), (7).

3. Compl. ¶ 106. "Gabelli-related entities" are defined as: Lynch Corp. ("Lynch"); Lynch Interactive Corp. ("Lynch Interactive"); Lynch PCS Communications Corp. ("Lynch PCS"); GAMCO Investors, Inc.; Gabelli Group Capital Partners, Inc. ("GGCP"); and Gabelli Funds, Inc. ("GFI"). *See id.* ¶ 109.

4. Specifically, the following defendants move for dismissal of the action against them: Lynch, Lynch Interactive; Lynch PCS; Lynch PCS Corporation A ("Lynch PCS A"); Lynch PCS Corporation B ("Lynch PCS B"); Lynch PCS Corporation C ("Lynch PCS C"); Lynch PCS Corporation D ("Lynch PCS D"); Lynch PCS Corporation E ("Lynch PCS E"), Lynch PCS Corporation F ("Lynch PCS F"); Lynch PCS Corporation H ("Lynch PCS H"); Lynch Paging Corp. ("Lynch Paging"); Fortunet Wireless Communications Corp. ("FWCC");

Aer Force Communications, Inc. ("Aer Force Inc."); Aer Force Communications LP ("Aer Force"); New England Wireless Communications, LP ("New England Wireless"); New England Wireless Communications Corp. ("NEWC"); Southeast Wireless Communications, LP ("Southeast Wireless"); Southeast Wireless Communications Corp. ("SWCC"); Fortunet Wireless Communications, LP ("Fortunet Wireless"); Fortunet Communications LP ("Fortunet"); High Country Communications, LP ("High Country"); High Country Communications Corp. ("HCCC"); Aer Force Communications II, LP ("Aer Force II"); BAL/Rivgam LLC ("BAL/Rivgam"); ABC–LMDS LLC ("ABC–LMDS"); BCDJMS LLP ("BCDJMS"); BCK/Rivgam LLC ("BCK/Rivgam"); Beta Communications LLC ("Beta"); Theta Communications LLC ("Theta"); Theta Communications I, LLC ("Theta I"); Theta Communications II, LLC ("Theta II"); Theta Communications IA, LLC ("Theta IA"); PTPMS Communications LLC ("PTPMS"); PTPMS II Communications LLC ("PTPMS II"); Betapage Communications LLC ("Betapage"); Sunshine PCS Corp. ("Sunshine"); Alfred Angelo; Karen Johnson; Victoria Kane; James Balitsos; Marie Balitsos; T. Gibbs Kane; Nara Cadorin; Clarence Davis; Kathleen Sugarman; Gary Sugarman; Katherine Stafford; Trent Tucker; Keith Mantle; Kuni Nakamura; Jennifer Caiati; Nancy Vanneck; and Thomas Wilson.

move to dismiss the action against them for failure to state a claim and/or plead fraud with the requisite particularity.[5] The "Rivgam defendants" and Mario Gabelli join in that motion.[6] For the reasons set forth below, the CWT defendants' motion to dismiss is granted in part and denied in part; and the Rivgam defendants' and Gabelli's motions to dismiss are denied.

Although these defendants are now represented by Covington & Burling, this motion was filed by their former counsel, Cadwalader, Wickersham & Taft LLP. Accordingly, for purposes of this motion, I refer to these defendants collectively as the "CWT defendants."

5. The various motions to dismiss were filed prior to the transfer of this action from the District of Columbia and, in addition to the Rules 12(b)(6) and 9(b) grounds, set forth an additional reason for dismissal—lack of subject-matter jurisdiction. Because (1) the District Court for the District of Columbia has already addressed this argument and concluded that this Court has subject-matter jurisdiction over this action, *see United States ex rel. Taylor v. Gabelli*, No. 01 Civ. 333 (D.D.C. Oct. 2, 2003), and (2) no new facts have been presented that cast doubt on that decision, I do not now address defendants' arguments relating to dismissal on jurisdictional grounds.

6. These defendants also argue separately, but on the same grounds, for dismissal. The "Rivgam defendants" are Rivgam Communicators, Inc. ("Rivgam Inc."), Rivgam Communicators, LLC ("Rivgam LLC"), GFI, GGCP, and Rivgam LMDS LLC ("Rivgam LMDS").

In addition, although GAMCO Investors, Inc. originally joined in the motion to dismiss, its motion was denied as moot on May 27, 2004. *See* 5/27/04 Order Dismissing GAMCO Investors, Inc.

7. Unless otherwise noted, the following facts are derived from the Complaint and presumed true for purposes of this motion.

8. In particular, Gabelli serves or served as the Chairman of Lynch and Lynch Interactive; Chairman and CEO of GGCP; and the Chief Investment Officer of Gabelli Funds, LLC and

## I. BACKGROUND[7]

### A. The Moving Parties

#### 1. The Individual Defendants

Gabelli is (or was) an officer of several of the corporate defendants, and the alleged mastermind of the fraudulent scheme underlying this action.[8] He drew friends, family members, and social and professional acquaintances into this fraud to pose as the "owners" of the sham entities.[9] In

GAMCO Investors, Inc.; and a director of East/West Communications Inc. *See* Compl. ¶ 15.

9. Specifically, the following defendants are alleged to hold or have held ownership interests in the various sham entities: Angelo (Beta, Betapage, PTPMS, PTPMS II, Theta, Theta IA), *see id.* ¶ 62; Johnson (PTPMS II, PTPMS, Fortunet Wireless, FWCC, Fortunet, NEWC, New England Wireless, Southeast Wireless, SEWC, Theta, Theta IA, Sunshine, BCDJMS), *see id.* ¶¶ 63, 128; Victoria Kane (Aer Force Inc., Aer Force, Aer Force B, Aer Force II, Fortunet Wireless, High Country, HCCC, Theta, Theta I, East/West Communications Inc., Fortunet, Sunshine), *see id.* ¶¶ 133–34; James Balitsos (BAL/Rivgam, ABC–LMDS, BCDJMS), *see id.* ¶ 142; Marie Balitsos (New England Wireless, Fortunet Wireless, Southeast Wireless, BCK/Rivgam, Theta, Theta IA, NEWC, SEWC, FWCC, Fortunet), *see id.;* Kathleen Sugarman (New England Wireless, Southeast Wireless, NEWC, SEWC), *see id.* ¶ 131; Gary Sugarman (BCDJMS), *see id.;* Cadorin (BCK/Rivgam, High Country, Southeast Wireless, Fortunet Wireless, FWCC, HCCC, ABC–LMDS, BCDJMS, SEWC), *see id.* ¶¶ 68, 141; Davis (Southwest Wireless, Fortunet Wireless, FWCC, SEWC), *see id.* ¶ 138; Nakamura (High Country, Fortunet Wireless, Southeast Wireless, HCCC, FWCC, and SEWC.), *see id.* ¶ 140; Stafford (High Country, Southeast Wireless, HCCC, and SEWC); *see id.* ¶ 130; Tucker (Fortunet Wireless, Southeast Wireless, FWCC, SEWC), *see id.* ¶ 139; Mantle (Southeast Wireless, Fortunet Wireless, BCDJMS, SEWC, and FWCC), *see id.* ¶ 136; Vanneck (Fortunet Wireless, Southeast Wireless, FWCC, SEWC), *see id.* ¶ 135; and Wilson .(Theta, Theta IA), *see id.* ¶ 129.

some cases, playing this part required them to certify "false" information about these companies to the FCC.[10] Other defendants were recruited to serve as officers in the various sham companies.[11]

### 2. The Corporate Defendants

At the center of the fraudulent scheme are Gabelli and the so-called Gabelli-related entities, which are alleged to have created "sham" bidding entities as well as direct and indirect owners of these bidders.[12] The following entities were purportedly established to participate in the FCC auctions as "bidders": (1) Fortunet Wireless, (2) High Country, (3) New England Wireless, (4) Southeast Wireless, (5) Aer Force, (6) Aer Force B, (7) BAL/Rivgam, (8) BCK/Rivgam, (9) Rivgam Communicators, (10) Beta, (11) BCDJMS, (12) ABC–LMDS, (13) Betapage, (14) PTPMS, (15) PTPMS II, and (16) Theta.[13]

These bidders were organized as limited partnerships, held by "indirect" (49.9%) and "direct" (50.1%) owners. The "indirect" owners include: Lynch PCS A (holds or held interests in Aer Force, Fortunet Wireless, High Country, New England Wireless, Southeast Wireless, and Fortunet); Lynch PCS B (New England Wireless); Lynch PCS C (High Country); Lynch PCS D (Southeast Wireless); Lynch PCS E (Fortunet Wireless); Lynch PCS F (Aer Force B); Lynch Paging (Betapage, PTPMS, and PTPMS II); Rivgam LLC (BAL/Rivgam); Rivgam LMDS (BCK/Rivgam); and Theta II (Theta). Among the "direct" owners are: Aer Force, Inc. (owns or owned Aer Force and Aer Force B and is co-owner of Theta I and Theta); FWCC (Fortunet Wireless); HCCC (High Country); NEWC (New England Wireless); SWCC (Southeast Wireless); Theta I (Theta); and Theta IA (co-owner of Theta I and Theta).[14]

### B. The FCC Auction Process

The Omnibus Budget Reconciliation Act of 1993,[15] amending the Communications Act of 1934, granted the FCC authority to

---

10. The following individuals are said to have certified fraudulent forms: Victoria Kane (Aer Force, Auction 5; Aer Force B, Auction 11); Marie Balitsos (New England Wireless, Auction 5; BCK/Rivgam, Auction 17); James Balitsos (BAL/Rivgam, Auction 14; ABC–LMDS, Auction 23); Cadorin (High Country, Auction 5); Davis (Southeast Wireless, Auction 5); Johnson (Fortunet Wireless, Auction 5; BCDJMS, Auction 22; Theta, Auction 35); Angelo (Beta, Auction 22; Betapage, Auction 26; PTPMS, Auction 30; and PTPMS II, Auction 33). *See id.* ¶¶ 176–77 (Auction 5); *id.* ¶ 216 (Auction 11); *id.* ¶ 250 (Auction 14); *id.* ¶¶ 230, 269 (Auction 17); *id.* ¶ 250 (Auction 22); *id.* ¶ 251 (Auction 23); *id.* ¶¶ 269, 281–82, 285–86 (Auction 26); *id.* ¶¶ 252, 269, 281–82 (Auction 30); *id.* ¶¶ 231, 269, 281–82 (Auction 33); *id.* ¶ 253 (Auction 35); *see also* Forms 175 for Aer Force (Auction 5), New England Wireless (Auction 5), High Country (Auction 5), Southeast Wireless (Auction 5), Fortunet Wireless (Auction 5), Aer Force B (Auction 11), BAL/Rivgam (Auction 14), BCK/Rivgam (Auction 17), Beta (Auction 22), BCDJMS (Auction 22), ABC–LMDS (Auction 23), Betapage (Auction 26), PTPMS (Auction 30), PTPMS II (Auction 33), Theta (Auction 35), Exs. 32–44, 46–48 to 9/19/02 Affidavit of James K. Robinson ("Robinson Aff."). Because the short and long-applications are referenced in the Complaint, albeit not attached, I shall consider them in deciding the motion to dismiss. *See, e.g.,* Compl. ¶¶ 83, 166–67, 171, 217–19, 236–40, 249, 268–69, 271, 281, 345.

11. For instance, T. Gibbs Kane served as a corporate officer of East/West Communications Inc. and a "control member" of Aer Force Inc. and Gary Sugarman was Lynch Corp.'s Director of Telecommunications. *See id.* ¶¶ 67, 131, 288.

12. *See id.* ¶¶ 109, 114–17.

13. *See id.* ¶ 114.

14. *See id.* ¶¶ 116–17.

15. Pub.L. No. 103–66.

award spectrum licenses "through a system of competitive bidding."[16] Notably, Congress directed the FCC, in designing auction procedures, to "promot[e] economic opportunity and competition and ensur[e] that [ ] innovative technologies are readily accessible to the American people by avoiding excessive concentration of licenses and by disseminating licenses among a wide variety of applicants, including small businesses."[17]

Pursuant to this congressional mandate, the FCC established a multiple-round auction process to award broadband personal communications services ("PCS") licenses.[18] To promote the distribution of licenses among a diverse group of businesses, auction procedures provide various incentives for small business participation. For instance, bidding in some auction blocks (e.g., Blocks "C" and "F") is restricted to "small businesses and other designated entities with total assets and revenues below certain levels."[19] In addition, certain small and very small businesses are eligible to receive "bidding credits" in the form of "percentage discount[s] applied to the high bid amount[s] for a license."[20]

Although both the percentage discounts offered and definition of "small business" vary by auction, the FCC uses substantially similar procedures for all auctions. *First*, the potential bidder must file a "short-form" application ("Form 175"), certifying, among other items, the applicant's eligibility for a federal discount and status as a qualified entity.[21] The WTB then determines whether each application is " 'accepted,' thereby entitling the applicant to participate in the auction, 'rejected,' such that the applicant is not eligible to bid in the auction, or 'incomplete.' "[22] *Second*, following the close of each auction, winning bidders are notified and have ten days to submit a "long-form" application—the Form 600 series. This form requires applicants to provide detailed information, including their entitlement to bidding credits and any agreements into which they have entered relating to the licenses.[23] Any applicant who fails to submit a timely long form or is otherwise defaulted or disqualified from receiving the license is subject to penalties under section 24.704(a)(2) of the federal regulations.[24]

**16.** 47 U.S.C. § 309(j)(1). "Spectrum" refers to the "range of electromagnetic radio frequencies used in the transmission of voice, data[,] and video." FCC Auctions Glossary, Ex. 27 to Robinson Aff., at 14.

**17.** 47 U.S.C. § 309(j)(1).

**18.** The Wireless Telecommunications Bureau (the "WTB") administers these auctions for the FCC. "PCS" refers to the range of radio communications services "enabl[ing] individuals to communicate [while] away from their home or office telephone or other wire-based system." FCC Auctions Glossary at 11.

**19.** *Federal Communications Comm'n v. Nextwave Pers. Communications*, 537 U.S. 293, 296, 123 S.Ct. 832, 154 L.Ed.2d 863 (2003).

**20.** FCC Auctions Glossary at 3.

**21.** *See* 47 C.F.R. § 1.2105. Potential bidders must also attach an exhibit "certified as truth-

ful under penalty of perjury, identifying all parties with whom the applicant has entered into partnerships, joint ventures, consortia or other agreements, arrangements or understandings of any kind relating to the licenses being auctioned, including any such agreements relating to the post-auction market structure." 47 C.F.R. § 1.2105(a)(2)(viii).

**22.** CWT Defendants' Memorandum of Law in Support of Their Motion to Dismiss Relator's First Amended Complaint ("CWT Defs. Mem.") at 12.

**23.** *See* 47 C.F.R. § 1.2107(a), (c).

**24.** *See* 47 C.F.R. § 24.704(a)(2) (noting that disqualified or defaulting bidders are subject to the standard penalties assessed for bids withdrawn prior to the close of the auction, and must pay an additional penalty equal to three percent of the subsequent winning bid).

For purposes of both forms, applicants must comply with the disclosure requirements set forth under section 1.2112 of the federal regulations, directing applicants to list:

(1) [T]he real party or parties in interest in the applicant or application, including a complete disclosure of the identity and relationship of those persons or entities directly or indirectly owning or controlling (or both) the applicant;

\* \* \* \* \* \*

(3) [I]n the case of a limited partnership, the name, address and citizenship of each limited partner whose interest in the applicant is 10 percent or greater ...;

(4) [I]n the case of a general partnership, the name, address and citizenship of each partner, and the share or interest participation in the partnership;

(5) [I]n the case of a limited liability company, the name, address, and citizenship of each of its members whose interest in the applicant is 10 percent or greater;

(6) [A]ll parties holding indirect ownership interests in the applicant as determined by successive multiplication of the ownership percentages for each link in the vertical ownership chain, that equals 10 percent or more of the applicant, except that if the ownership percentage for an interest in any link in the chain exceeds 50 percent or represents actual control, it shall be treated and reported as if it were a 100 percent interest; and

(7) [A]ny FCC-regulated entity or applicant for an FCC license, in which the applicant or any of the parties identified in paragraphs [(1) through (5)], owns 10 percent or more of stock.... This list must include a description of each such entity's principal business and a description of each such entity's relationship to the applicant....[25]

A bidder seeking the benefits associated with "small business" status must also provide the following information:

(i) [T]he names, addresses, and citizenship of all officers, directors, affiliates, and other controlling interests of the applicant....;

(ii) [A]ny FCC-regulated entity or applicant for an FCC license, in which any controlling interest of the applicant owns a 10 percent or greater interest or a total of 10 percent or more of any class of stock, warrants, options or debt securities. This list must include a description of each such entity's principal business and a description of each such entity's relationship to the applicant; and

(iii) [S]eparately and in the aggregate the gross revenues ... for ... The applicant, its affiliates, its controlling interests, and affiliates of its controlling interests; and if a consortium of small businesses, the members comprising the consortium.[26]

## C. Defendants' Alleged Fraud

Taylor alleges that, beginning in 1995, Gabelli and the Gabelli-related entities created several dozen companies to bid on licenses and/or to serve as owners of these bidders. These organizations were purportedly established for the purpose

---

**25.** 47 C.F.R. § 1.2112(a).

**26.** 47 C.F.R. § 1.2112(b)(1). In the supporting exhibits, the applicant must list and summarize: "[A]ll agreements or instruments ... that support the applicant's eligibility as a small business under the applicable designated entity provisions, including the establishment of de facto or de jure control." 47 C.F.R. § 1.2112(b)(2)(iii).

of "acquir[ing] federally discounted licenses as investments to be later sold for profit in the after-market," and not for the legitimate objective of "develop[ing] or offer[ing] spectrum services under the acquired licenses, or to operate actual business operations."[27]

A "cornerstone" of this fraudulent scheme was Gabelli's use of various individual defendants—"all of whom had ties of loyalty to [him]" to serve as "owners" and/or officers of these bidding entities.[28] These bidders began participating in the auction process in the mid–1990s—taking part in Auctions 5 and 11, during which they are alleged to have established a "template" for their future fraudulent conduct.[29]

### 1. AUCTIONS 5 AND 11 (1995–1996)

#### a. Auction 5

In Auction 5, the FCC conducted bidding for broadband PCS Block C licenses among bidders with gross revenues and total assets of less than $125 million and $500 million, respectively. The FCC offered a 25% discount to qualified "small" businesses with gross annual revenues not exceeding "$40 million averaged over the preceding three years."[30]

The first step in the fraudulent bidding scheme involved the creation of a series of indirect owners in June and July of 1995.[31] To that end, Gabelli, Gabelli-related entities, and/or their agents prepared and submitted the legal documents necessary to incorporate these corporations under Delaware law. Next, a few days before the submission deadline, various partnerships were created to serve as bidders—Fortunet Wireless, New England Wireless, Southeast Wireless, and High Country. A fifth Gabelli-related bidder, Aer Force, also filed a short-form application for this auction.[32]

Gabelli and Gabelli-related entities helped to prepare and file the short and long-form applications on which the sham bidders "made numerous fraudulent statements and omissions to the FCC."[33] For instance, these applications: (1) certified that the applicants were qualified to "participate in the restricted-eligibility auctions" and to receive the federal discounts for small businesses; (2) provided "dummy addresses" corresponding to the private residences of the various individual defendants; (3) "knowingly" failed to "attribute the assets and revenues of [ ] Gabelli and Gabelli-related entities," which exercised de facto control over the bidders; and (4) presented individuals as "owners" of the bidding partnerships who lacked "experience or ability to contribute meaningfully to the [ ] application or bidding process."[34]

On September 17, 1996, the PCS licenses from Auction 5 were awarded. Each of the Gabelli bidders acquired discounted Block C licenses. The total value of these licenses and discounts is about $285 million

---

27. Compl. ¶ 110.

28. *Id.* ¶ 113.

29. *See id.* ¶¶ 160–299.

30. Compl. ¶¶ 86, 161.

31. Specifically, on June 1, 1995, the following 49.9% owners were organized: Lynch PCS A, Lynch PCS B, Lynch PCS C, Lynch PCS D, and Lynch PCS E. On July 21, 1995, the following 50.1% owners were simultaneously established: HCCC, NEWC, SEWC, and FWCC. *See id.* ¶ 168.

32. *See id.* ¶ 167. Aer Force is alleged to have "falsely represented ... that it was a limited partnership" in its Form 175. *Id.*

33. *Id.* ¶ 246.

34. *Id.* ¶ 183; *see also id.* ¶¶ 172–73, 175, 178.

and $65 million, respectively.[35] Within a year, the licenses were transferred to Fortunet, a successor to the assets and liabilities of Fortunet Wireless, High Country, New England Wireless, Southeast Wireless, and Aer Force; 49.9% owners NEWC, SEWC, and HCCC merged into and with FWCC; and 50.1% owners Lynch PCS B, Lynch PCS C, Lynch PCS D, Lynch PCS E, and Lynch PCS F merged into and with Lynch PCS A.[36]

### b. Auction 11

In 1996, the FCC conducted Auction 11, offering Broadband PCS licenses in Blocks D, E, and F. Two levels of federal discounts were made available to qualifying "very small" and "small" businesses. Applicants claiming "gross annual revenues of not more than $15 million averaged over the preceding three years," qualified for the "very small" business discount of 25%.[37] "Small" businesses; or companies "with gross annual revenues of not more than $40 million averaged over the preceding three years," were entitled to a 15% discount.[38]

The Gabelli company involved in this auction, Aer Force B, was 50.1% owned by Aer Force Inc. (which was, in turn, wholly owned by Victoria Kane) and 49.9% owned by Lynch PCS F.[39] Aer Force B was a thinly capitalized company that derived its financing as debt from Gabelli Funds Inc.[40]

and "fraudulently claimed and certified that it was a 'very small' business."[41] Aer Force B successfully bid for licenses in various markets and because it qualified as a "very small" business, was given a 25% discount on these licenses. Within approximately one year, Aer Force B was merged into East/West Communications Inc. (previously named ARF Communications B, Inc.), which was later acquired by Omnipoint Corp.[42]

### 2. Auctions 14, 17, 22, 23, 26, 30, 33, and 35 (1997–2000)

### a. Requirements for Participation

Auctions 14 (Wireless Communications Services licenses) and 30 (39 Gigahertz Band licenses) permitted "small" and "very small" businesses to receive a 25% and 35% discount, respectively.[43] In Auction 17 (Local Multipoint Distribution Service licenses), the FCC provided 45% " 'very small['] business discounts for entities with average gross annual revenues of not more than $15 million for each of the preceding three years, and 'small business' [discounts for applicants] with gross annual revenues of not more than $40 million for each of the preceding three years were entitled to 35[%] discounts."[44] The definitions of "small" and "very small" businesses used in Auction 11 applied to Auctions 22 (Broadband PCS C, D, E, and F

---

35. *See id.* ¶ 199.

36. *See id.* ¶¶ 200–01. In 1998, Fortunet surrendered various of these licenses "in connection with the FCC's auction-wide restructuring option for Block C Broadband license debt," leaving it with three licenses. *Id.* ¶ 341. Fortunet did not, however, return the value of the bidding credits relating to these licenses.

37. *Id.* ¶ 86.

38. *Id.*

39. *See id.* ¶¶ 204, 212.

40. *See id.* ¶ 213.

41. *Id.* ¶ 216.

42. *See id.* ¶¶ 222–23.

43. Businesses with "gross revenues of not more than $40 million [and not more than $15 million] for each of the preceding three years," were considered "small" and "very small" businesses, respectively. *Id.* ¶ 86.

44. *Id.*

Block licenses) and 33 (Upper 700 Megahertz Guardband licenses). For purposes of Auction 26 (929 and 931 Megahertz Paging Service licenses), "very small" businesses (*i.e.,* businesses with average gross revenues not in excess of $3 million for the preceding three years) were entitled to a 35% discount," and "small" businesses (*i.e.,* businesses with average gross revenues in excess of $15 million for the preceding three years) were entitled to a 25% discount.[45]

### b. Gabelli Auction Participation

Taylor avers that Gabelli and Gabelli-related entities followed the pattern of fraud established in Auctions 5 and 11. *First,* they created sham bidders and owners just before or after the auction deadline.[46] *Second,* the bidders falsely certified on their short and long forms that they were "very small businesses," eligible for federal discounts. *Third,* the bidders failed to disclose to the FCC that Gabelli and Gabelli-related businesses provided financial backing and exercised managerial control over the bidders.

*Fourth,* some of the bidders made "additional fraudulent representations and omissions" to the FCC.[47] For instance, BCK/Rivgam made various false statements when questioned by an FCC staff engineer about its "supermajority approvals and borrower covenants contained in [its] financing and limited liability company agreements with [its] 49.9% owner, Rivgam LMDS."[48] These misrepresentations included the following: (1) "BCK/Rivgam was formed to develop LMDS licenses for the provision of services"; (2) "Marie Balitsos and [ ] Cadorin exercised both *de jure* and *de facto* control over the company"; and (3) "its 'minority' 49.9[%] investor [Rivgam LMDS] was primarily a financial [ ] and [ ] *not* an operational investor."[49]

Of the nine bidders, only two—ABC-LMDS and BCDJMS—were not granted licenses.[50] The other seven applicants won spectrum licenses and claimed attendant federal "very small" business discounts.

### 3. Resale of Various Spectrum Licenses in the After–Market

Taylor avers that defendants acquired the licenses "as arbitrage opportunities,

---

45. Taylor does not provide eligibility guidelines relating to Auctions 23 and 35, but indicates that they were subject to similar requirements. *See id.* ¶¶ 224, 227.

46. In particular, the following companies served as owners and bidders, as noted: (1) Auction 14—BAL/Rivgam (50.1% owned by James Balitsos, 49.9% owned by Rivgam LLC); (2) Auction 17—BCK/Rivgam (50.1% owned by Marie Balitsos and Cadorin, collectively; and 49.9% owned by Rivgam LMDS); (3) Auction 22—Beta (50.1% owned by Angelo, 49.9% by GFI), BCDJMS (50.1% owned by James Balitsos, Cadorin, Johnson, Mantle, and Gary Sugarman, collectively; 49.9% by Lynch PCS H); (4) Auction 23—ABC–LMDS (50.1% owned by James Balitsos and Cadorin, collectively; 49.9% by GFI); (5) Auction 26—Betapage (50.1% owned by Angelo, 49.9% by Lynch Paging); (6) Auction 30—PTPMS (50.1% owned by Augelo and Johnson, collec-

tively; 49.9% by Lynch Paging); (7) Auction 33—PTPMS II (50.1% owned by Angelo and Johnson, collectively; 49.9% by Lynch Paging); (8) Auction 35—Theta (50.1% owned by Theta I; 49.9% by Theta II). *See id.* ¶¶ 230–33; *see also* Forms 175 for BAL/Rivgam (Auction 14); BCK/Rivgam (Auction 17); Beta & BCDJMS (Auction 22); ABC–LMDS (Auction 23); Betapage (Auction 26); PTPMS (Auction 30); PTPMS II (Auction 33); Theta (Auction 35).

47. Compl. ¶ 270.

48. *Id.* ¶ 271.

49. *Id.* ¶¶ 273–74, 276. Betapage, PTPMS, PTPMS II, and Theta are also alleged to have omitted key financial information in their auction applications. *See id.* ¶¶ 280–92.

50. *See id.* ¶ 233.

and not as assets to develop for the provision of telecommunications services."[51] Gabelli and/or Gabelli-related entities "functioned as the broker or 'finder' of the purchasing party and received substantial 'fees' as a result."[52] On at least three occasions, the discounted licenses were sold for profit.[53] In the process of transferring the licenses, the original licenseholders (Aer Force B, BCK/Rivgam, and Beta) purportedly made various misrepresentations to the FCC relating to the assets and revenues of the license-recipients.

#### 4. The Sunshine Fraud

Sunshine, as the successor to Fortunet's assets, received various PCS broadband licenses from its predecessor company. Sunshine allegedly made "numerous fraudulent statements and omissions to the FCC on its application Form 603 and related submissions, particularly with regard to stock ownership."[54] For instance, in its disclosures to the FCC, Sunshine failed to state that "Gabelli and Gabelli-related entities are affiliates, with assets and revenues attributable to the applicant and power to control the applicant directly or indirectly."[55] Sunshine also "falsely represented that it qualified as both an entrepreneur and a small business, and that no unjust enrichment payments are due or owing."[56] Further, Sunshine purportedly misled the

FCC by constructing a "bare-bones" wireless system that appeared to, but did not, comport with the requirement that it build a PCS network by September 17, 2001.[57]

## II. APPLICABLE LAW

### A. Legal Standards

#### 1. Dismissal for Failure to State a Claim

At the motion to dismiss stage, the issue " 'is not whether a plaintiff is likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims. Indeed it may appear on the face of the pleading that a recovery is very remote and unlikely but that is not the test.' "[58] The task of the court in ruling on a Rule 12(b)(6) motion is "merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof."[59]

■ When deciding a motion to dismiss pursuant to Rule 12(b)(6), courts must accept all factual allegations in the complaint as true and draw all reasonable inferences in plaintiff's favor.[60] In general, courts may not consider matters outside the pleadings. For purposes of Rule 12(b), the complaint includes " 'any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference.' "[61] Courts can, however,

---

51. *Id.* ¶ 305.

52. *Id.* ¶ 309.

53. *See id.* ¶ 310. These three transactions are as follows, from: Aer Force B through East/West to Omnipoint; BCK/Rivgam to High-Speed.com LLC; and Beta to Lone Star Wireless, LLC and Leap Wireless International, Inc. *See id.* ¶¶ 312–37.

54. *Id.* ¶ 343.

55. *Id.* ¶ 349.

56. *Id.* ¶ 350.

57. *Id.* ¶ 357.

58. *Phelps v. Kapnolas,* 308 F.3d 180, 184–85 (2d Cir.2002) (per curiam) (quoting *Chance v. Armstrong,* 143 F.3d 698, 701 (2d Cir.1998)).

59. *Saunders v. Coughlin,* No. 92 Civ. 4289, 1994 WL 88108, at *2 (S.D.N.Y. Mar. 15, 1994).

60. *See Chambers v. Time Warner, Inc.,* 282 F.3d 147, 152 (2d Cir.2002).

61. *Id.* (quoting *International Audiotext Network, Inc. v. American Tel. & Tel. Co.,* 62 F.3d 69, 72 (2d Cir.1995)).

take into account "matters of which judicial notice may be taken."[62]

### 2. Dismissal for Failure to Plead Fraud with Particularity

 Because general accusations of fraud are thought to be too amorphous to provide a defendant with sufficient notice to permit a response, fraud claims are subject to the heightened pleading standard of Rule 9(b), which requires that "the circumstances constituting fraud or mistake shall be stated with particularity."[63] The pleading requirements set forth in Rule 9(b), which apply to claims brought under the FCA,[64] require a complaint to: "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."[65] The Second Circuit has further explained, "[a]lthough scienter need not be alleged with great specificity, there must be some factual basis for conclusory allegations of intent. Allegations of scienter are sufficient if supported by facts giving rise to a strong inference of fraudulent intent."[66] A "strong inference of fraudulent intent," in turn, can be pled in one of two ways:

First, the plaintiff may allege a motive for committing fraud and a clear opportunity for doing so. Second, where motive is not apparent, it is still possible to plead scienter by identifying circumstances indicating conscious behavior by the defendant, though the strength of the circumstantial allegations must be correspondingly greater.[67]

"Ordinarily, allegations of fraud cannot be founded solely upon information and belief, except as to those matters particularly within the opposing party's knowledge; in the latter instance, allegations must be accompanied by statements of facts upon which such belief is reasonably founded."[68]

 Notably, where a case involves complex or extensive fraudulent schemes, courts have "relaxed" Rule 9(b)'s pleading requirements.[69] Additionally, where the fraudulent conduct is alleged to have taken place over a number of years, "the requirements of Rule 9(b) are less stringently applied."[70] "To approach the issue otherwise would allow the more sophisticated to escape liability . . . due to the complexity of their scheme and their deviousness in escaping detection."[71]

**62.** *United States ex rel. Phipps v. Comprehensive Community Dev. Corp.*, 152 F.Supp.2d 443, 448 (S.D.N.Y.2001) (quoting *Leonard F. v. Israel Discount Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir.1999)).

**63.** Fed.R.Civ.P. 9(b); *see also In re Initial Pub. Offering Sec. Litig.*, 241 F.Supp.2d 281, 325 (S.D.N.Y.2003).

**64.** *See Gold v. Morrison–Knudsen Co.*, 68 F.3d 1475, 1477 (2d Cir.1995); *see also United States ex rel. Karvelas v. Melrose–Wakefield Hosp.*, 360 F.3d 220, 227–28 (1st Cir.2004); *Phipps*, 152 F.Supp.2d at 454.

**65.** *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir.1993); *see also Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir.2004).

**66.** *Ouaknine v. MacFarlane*, 897 F.2d 75, 78–80 (2d Cir.1990) (quotation marks and citations omitted).

**67.** *Powers v. British Vita, P.L.C.*, 57 F.3d 176, 184 (2d Cir.1995) (citations, quotation marks, and alterations omitted).

**68.** *Phipps*, 152 F.Supp.2d at 455 (quotation marks and citations omitted).

**69.** *In re Cardiac Devices Qui Tam Litig.*, 221 F.R.D. 318, 333 (D.Conn.2004) (involving FCA claims) (citing cases).

**70.** *Id.*

**71.** *Id.*

## B. Qui Tam Actions Under the FCA

The FCA was enacted at the height of the Civil War in response to the disclosure of "widespread fraud" perpetrated against the Government.[72] Since its inception, the "FCA scheme" has included *qui tam* suits, premised on the "basic idea [ ] that a private citizen with personal knowledge of [ ] fraud may bring suit on the government's behalf in return for a cut of the proceeds should the suit prevail."[73] To that end, the Act authorizes an individual to "bring a civil action for a violation of section 3729 for the [plaintiff, known as the *qui tam* 'relator'] and for the [ ] Government."[74] The Government then has the option of either intervening in and prosecuting the action or allowing the relator to proceed pursuant to section 3730(b)(4)(B).[75]

Under the FCA, "[a]ny person" who, *inter alia:*

(1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government … a false or fraudulent claim for payment or approval;

(2) knowingly makes, uses, or causes to be made or used, a false record or state-ment to get a false or fraudulent claim paid or approved by the Government;

(3) conspires to defraud the Government by getting a false or fraudulent claim allowed or paid;

may be liable to the Government for civil penalties and/or treble damages, and costs.[76] The FCA also contains a cause of action for so-called "reverse false claims," where the person "knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government."[77]

### 1. Section 3729(a)(1)-(2)

■ To state a claim under section 3729(a)(1), a plaintiff must allege that the defendant: "(1) made a claim [ ] to the [Government], [(2)] that is false or fraudulent, [(3)] knowing of its falsity, [(4)] seeking payment from the federal treasury."[78] A few courts have found that, to prevail, a plaintiff must ultimately prove that the Government sustained actual damages as a result of the defendant's conduct; however, the weight of authority suggests that

---

**72.** *Mikes v. Straus,* 274 F.3d 687, 692 (2d Cir.2001). Specifically, it was discovered that the Government "had been billed for nonexistent or worthless goods, had been charged exorbitant prices, and had its treasury plundered by profiteering defense contractors." *Id.* As chronicled by one commentator:

Congressional hearings held in 1862 and 1863 produced over 3,000 pages of testimony regarding alleged fraud and waste in government contracts. The hearings led to the court martial of Major Justus McKinstry, an Army quartermaster who was accused of overseeing an enormously lucrative and corrupt procurement empire, complete with kickbacks to a relation by marriage.

John T. Boese, 1 Civil False Claims and Qui Tam Actions § 1.01, at 1–6.1 (2d ed. & Supp. 2003–2).

**73.** *United States ex rel. Lamers v. City of Green Bay,* 168 F.3d 1013, 1016 (7th Cir.1999).

**74.** 31 U.S.C. § 3730(b)(1).

**75.** *See United States ex rel. Kreindler v. United Techs.,* 985 F.2d 1148, 1153 (2d Cir.1993). The Act imposes a six-year statute of limitations on private rights of action. *See* 31 U.S.C. § 3731(b).

**76.** 31 U.S.C. § 3729(a). For purposes of the FCA, a "person" includes "persons [ ] incorporate." *Cook County v. United States ex rel. Chandler,* 538 U.S. 119, 119, 123 S.Ct. 1239, 155 L.Ed.2d 247 (2003).

**77.** 31 U.S.C. § 3729(a)(7).

**78.** *Mikes,* 274 F.3d at 695.

there is no damages element.[79] Even where courts permit recovery absent specific proof of damages, most still require "some direct impact on the Federal Treasury,"[80] which is consistent with the primary purpose of the Act—to return ill-gotten federal monies from the defendant to the Government.

■ To allege a violation of section 3729(a)(2), a plaintiff must aver that the defendant: (1) created, used, or caused to be used, a record or statement to the Government; (2) that is false or fraudulent, (3) knowing of its falsity, (4) to get a false or fraudulent claim paid or approved by the government.[81] The objective of this provision is to "remove any defense that the defendant did not personally submit a false claim directly to the government. Obviously, many violations of this section may also be considered violations of [section 3729(a)(1)] under the 'causes to be presented' language."[82] Thus, stating a claim under this provision requires a relator or plaintiff to plead elements similar to those set forth under section 3729(a)(1). However, pleading a claim under section 3729(a)(2) is more difficult—the relator must allege not only that the claim was knowingly false, but that the "record supporting the claim is false" and that the "record is made or used for the purpose of

---

79. For support of the view that there is a damages element, see, for example, *United States ex rel. Mikes v. Straus*, 84 F.Supp.2d 427, 440 (S.D.N.Y.1999), *aff'd*, 274 F.3d 687 (citing cases in which courts required proof of damages); *see also, e.g., id.* (finding inclusion of a damages element persuasive); *Young–Montenay, Inc. v. United States*, 15 F.3d 1040, 1043 (Fed.Cir.1994); *accord UMC Elecs. Co. v. United States*, 43 Fed.Cl. 776 (1999), *aff'd*, 249 F.3d 1337 (Fed.Cir.2001); *United States ex rel. Reagan v. East Tex. Med. Ctr. Reg'l Healthcare Sys.*, 274 F.Supp.2d 824, 861 (S.D.Tex.2003).

The Fourth Circuit has disagreed, noting that although "[s]ome courts have asserted that there is an additional element that the United States must have suffered some damages as a result of the false or fraudulent claim[,] [i]n fact there is no [such] requirement." *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 785 n. 7 (4th Cir. 1999) (citing cases); *see also, e.g., United States v. Medica–Rents Co.*, 285 F.Supp.2d 742, 769 n. 60 (N.D.Tex.2003) ("Some courts have [ ] held that there is a damage element: that the United States suffered damages as a result of the false or fraudulent claim. However, the 'Supreme Court and the Fifth Circuit have rejected the additional requirement that the United States have suffered damages as a result of the false or fraudulent claim.' ") (citations omitted) (citing cases); *Hutchins v. Wilentz, Goldman & Spitzer*, 253 F.3d 176, 183 (3d Cir.2001) ("While recovery under the [False Claims Act] is not dependent upon the government's sustaining monetary damages,

the Act is only intended to cover instances of fraud that might result in financial loss to the Government.") (quotation marks and citations omitted); *Varljen v. Cleveland Gear Co.*, 250 F.3d 426, 429 (6th Cir.2001); *United States ex rel. Schwedt v. Planning Res. Corp.*, 59 F.3d 196, 199 (D.C.Cir.1995) (noting that proof of damages is required only for treble damages, not for the civil penalty).

The Second Circuit has not addressed this issue. *See Mikes*, 84 F.Supp.2d at 440 ("[T]here is a split of authority as to whether a relator is required to establish that the Government has suffered damages as a result of the false claim against it. Although the Second Circuit has affirmed a decision stating that damages are a necessary element of a claim under the FCA, it did not address this issue upon its review."); *see also Mikes*, 274 F.3d at 695 ("Because plaintiff's claims fail on other grounds, we need not decide whether the Act contains another element of proof, namely a showing that the United States sustained damages."). Because Taylor has alleged that the Government suffered damages in the amount of the bidding credits, it is not necessary to resolve this issue for purposes of this motion.

80. Boese, *supra* note 72, § 2.01[A][1], at 2–19 (Supp. 2004–1).

81. *See Mikes*, 84 F.Supp.2d at 432.

82. Boese, *supra* note 72, at § 2.01[B] (Supp. 2004–1).

causing the false claim to be paid."[83]

### a. Made a Claim to the Government

■ Under the FCA, a "claim" covers: Any request or demand ... for money or property which is made to a contractor, grantee, or other recipient if the [] Government provides any portion of the money or property which is requested or demanded, or if the Government will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded.[84]

The Supreme Court has counseled that the term "claim" should be construed broadly, explaining that the FCA "reaches beyond 'claims' which might be legally enforced to all fraudulent attempts to cause the Government to pay out sums of money."[85] This expansive reading is consistent with the legislative history, which suggests that the Act was intended to cover " 'each and every claim submitted ... by means of false statements, or other corrupt or fraudulent conduct, or in violation of any statute or applicable regulation.' "[86]

### b. That is False or Fraudulent

"Because the Supreme Court has held that the FCA is 'intended to reach all types of fraud, without qualification, that might result in financial loss to the Government,' a number of courts have interpreted the phrase 'false or fraudulent' broadly."[87] But even liberally construed, "false or fraudulent" is subject to some limitations. The Second Circuit has observed that "[t]he juxtaposition of the word 'false' with the word 'fraudulent,' plus the meanings of the words comprising the phrase 'false claim,' suggest an improper claim is aimed at extracting money the government otherwise would not have paid."[88] That is, the defendant's misconduct must be linked to the government's decision to pay.[89] Courts have found, however, that "errors based simply on faulty calculations or flawed reasoning," "imprecise statements or differences in interpretation growing out of disputed legal question," and scientific judgments are not false under the FCA.[90]

■ Courts in this Circuit recognize that a statement may be false or fraudulent under the so-called "certification theory" of liability whereby a statement may be: "[(1)] factually false, [(2)] legally false under an 'express false certification' theory, or [(3)] legally false under an 'implied

---

**83.** *Id.* § 2.01[C], at 2–24 (2004–1 Supp.).

**84.** 31 U.S.C. § 3729.

**85.** *United States v. Neifert–White Co.,* 390 U.S. 228, 233, 88 S.Ct. 959, 19 L.Ed.2d 1061 (1968).

**86.** *United States v. Incorporated Village of Island Park,* 888 F.Supp. 419, 439 (E.D.N.Y. 1995) (quoting S.Rep. No. 345 at 9, *reprinted in* 1986 U.S. Code Cong. and Admin. News 5266, 5274) (emphasis added).

**87.** *U.S. ex rel. Augustine v. Century Health Servs., Inc.,* 289 F.3d 409, 413 (6th Cir.2002) (quoting *Neifert–White,* 390 U.S. at 232, 88 S.Ct. 959).

**88.** *Mikes,* 274 F.3d at 696.

**89.** *See id.*

**90.** *See Lamers,* 168 F.3d at 1018; *see also Pfingston v. Ronan Eng'g,* 284 F.3d 999, 1003 (9th Cir.2002) (" '[F]alse' does not mean 'scientifically untrue, but a lie.' ") (quoting *Wang v. FMC Corp.,* 975 F.2d 1412, 1421 (9th Cir. 1992)); *Wang,* 975 F.2d at 1421 ("The Act is concerned with ferreting out 'wrongdoing,' not scientific errors. What is false as a matter of science is not, by that very fact, wrong as a matter of morals. The Act would not put either Ptolemy or Copernicus on trial.") (citation omitted).

certification' theory."[91] " 'Factually false' certification involves an incorrect description of goods or services provided or a request for reimbursement for goods or services never provided."[92] By contrast, "[a]n implied false certification claim is based on the notion that the act of submitting a claim for reimbursement itself implies compliance with governing federal rules that are a precondition to payment."[93] Finally, under the "express false certification theory" of liability, a plaintiff may bring an FCA action premised on defendant's "false representation of compliance with a federal statute or regulation."[94] However, such liability *cannot* be predicated on a defendant's failure to comply with the mandates of a statute or regulation "that is only tangential to the service for which reimbursement is sought."[95] In other words, "a claim under the Act is legally false only where a party certifies compliance with a statute or regulation as a condition to governmental payment."[96]

### c. Knowing of Its Falsity

■ For purposes of the FCA, "knowing" and "knowingly" do not require proof of a "specific intent" to defraud. Indeed, in amending the Act in 1986, Congress explained that "specific intent to defraud would no longer be required to satisfy the scienter element of the Act," noting that:

> its purpose in lowering the threshold was to impose upon individuals and contractors receiving public funds "some duty to make a limited inquiry so as to be reasonably certain they are entitled to the money they seek," and to "preclude 'ostrich' type situations where an individual has 'buried his head in the sand' and failed to make any inquiry that would have revealed the false claim."[97]

Accordingly, "knowing" and "knowingly" are given special meaning by the FCA as: "(1) ha[ving] actual knowledge of the information; (2) act[ing] in deliberate ignorance of the truth or falsity of the information; or (3) act[ing] in reckless disregard of the truth or falsity of the information."[98] The Ninth Circuit has explained this concept, noting that:

> Innocent mistake is a defense to the [ ] civil complaint. So is mere negligence. The statutory definition of "knowingly" requires at least "deliberate ignorance" or "reckless disregard" . . . [W]hat constitutes the offense is not intent to deceive but knowing presentation of a claim that is either "fraudulent" or simply "false." The requisite intent is the knowing presentation of what is known to be false.[99]

---

91. *In re Cardiac Devices Qui Tam Litig.*, 221 F.R.D. at 342 (citing *Mikes*, 274 F.3d at 697). One commentator has broadly categorized FCA cases as: (1) mischarge, (2) fraud-in-the-inducement or false negotiation, (3) false certification, (4) substandard product or service, or (5) reverse false claim suits. Boese, *supra* note 72, § 1.06, at 1–38–43 (2003–1 Supp.). Although this action contains features common to both category 2 and 3 cases, it is *most* akin to false certification cases and is treated as such for purposes of this motion.

92. *Mikes*, 274 F.3d at 697.

93. *Id.* at 699.

94. *Id.* at 696.

95. *Id.*

96. *Id.*

97. *Mikes*, 84 F.Supp.2d at 438 (quoting S.Rep. No. 99–345 at 20–21, *reprinted in* 1986 U.S. Code Cong. and Admin, News 5266, 5285).

98. 31 U.S.C. § 3729(b).

99. *Wang*, 975 F.2d at 1420 (quoting *United States ex rel. Hagood v. Sonoma County Water Agency*, 929 F.2d 1416, 1421 (9th Cir.1991)).

### d. Seeking Payment from the Federal Treasury

■ This element "further supports the conclusion that the statute reaches only those claims with the potential wrongfully to cause the government to disburse money."[100] The Supreme Court "has further indicated that the Act's primary purpose is to indemnify the government—through its restitutionary penalty provisions—against losses caused by a defendant's fraud."[101]

### 2. Section 3729(a)(3)

■ Section 3729(a)(3) creates liability for civil conspiracies under the FCA, requiring a plaintiff to aver that: "(1) the defendant conspired with one or more persons to get a false or fraudulent claim allowed or paid by the United States [and] (2) one or more conspirators performed any act to effect the object of the conspiracy."[102] In other words, there must be an agreement to defraud the government between two or more persons coupled with "any act to get a false or fraudulent claim allowed or paid."[103] The district court in *Mikes* suggests that the relator must also allege that the Government "has suffered damages as a result of the false or fraudulent claim."[104] General civil conspiracy principles apply to claims brought under section 3729(a)(3).[105]

### 3. Section 3729(a)(7)

■ Section 3729(a)(7) imposes liability for "reverse false claims," providing that "an individual who makes a material misrepresentation to avoid paying money owed the Government would be equally liable under the act as if he had submitted a false claim to receive money."[106] To state a claim under this provision, a plaintiff must allege that the defendant: (1) made a false statement or created and used a false record, (2) with knowledge of

---

**100.** *Mikes*, 274 F.3d at 696.

**101.** *Id.* (citing *United States ex rel. Marcus v. Hess*, 317 U.S. 537, 549, 551–52, 63 S.Ct. 379, 87 L.Ed. 443 (1943)).

**102.** *Mikes*, 84 F.Supp.2d at 432.

**103.** *United States ex rel. Atkinson v. Pennsylvania Shipbuilding Co.*, 255 F.Supp.2d 351, 371–72 (E.D.Pa.2002) (quotation marks and citation omitted).

**104.** *Mikes*, 84 F.Supp.2d at 432 (citing *Blusal Meats, Inc. v. United States*, 638 F.Supp. 824, 828 (S.D.N.Y.1986), *aff'd*, 817 F.2d 1007 (2d Cir.1987)); *see also* Boese, *supra* note 72, § 2.01[C][5], at 2–32–33 (2003–2 Supp.) ("The express language of Section 3729(c)(3) requires that the 'false or fraudulent claim' must be 'allowed or paid.' This language requires actual payment and thus, actual damages."). However, the *Blusal Meats* court specifically states that "[p]roof that a false claim was actually presented to or *paid by the government* as a result of the conspiracy is not necessary for a defendant to be held liable for the civil penalty ... under § 3729(3)

for each conspiracy proven." *Blusal Meats*, 638 F.Supp. at 828 (emphasis added). Moreover, many courts confronted with FCA conspiracy claims have omitted the damages element. *See, e.g., United States v. President and Fellows of Harvard College*, 323 F.Supp.2d 151, 196 (D.Mass.2004); *Atkinson*, 255 F.Supp.2d at 371; *United States v. Sforza*, No. 00 Civ. 1307, 2000 WL 1818686, at *5 (S.D.N.Y. Dec. 12, 2000). It is not necessary for this Court to resolve this issue for purposes of this motion. *See supra* note 79.

**105.** *See United States ex rel. Durcholz v. FKW Inc.*, 189 F.3d 542, 546 n. 3 (7th Cir.1999).

**106.** S.Rep. No. 99–345, *reprinted in* 1986 U.S. Code Cong. and Admin. News 5266, 5283. "Section 3729(a)(7) is known as the 'reverse false claims' provision because it covers claims of money owed to the government, rather than payments made by the government, as in subsection(a)(1)." *United States ex rel. Capella v. Norden Sys., Inc.*, No. 94 Civ.2063, 2000 WL 1336487, at *10 (D.Conn. Aug. 24, 2000); *accord United States ex rel. Doe v. Dow Chem. Co.*, 343 F.3d 325, 329 (5th Cir.2003).

its falsity, (3) for the purpose of decreasing, concealing, or avoiding an obligation to pay the Government.[107] Although the Act does not define the word "obligation," courts have found that a defendant's obligation must be a "present duty to pay money or property that was created by a statute, regulation, contract, judgment, or acknowledgment of indebtedness," as contrasted with a "potential liability" or penalty.[108]

## III. DISCUSSION

As an initial matter, defendants argue that the Act does not apply to a false statement presented in an FCC auction application.[109] Specifically, defendants contend that because "Congress has empowered the FCC with the ability to promulgate its own remedial scheme for violations of FCC regulations," courts should leave the FCC to "enforce its own regulatory scheme to determine whether a violation [has] occurred and how it should be addressed and punished."[110] Defendants further contend that the FCC's

> significant involvement in and approval of the process now challenged in the Complaint demonstrates the very reason the FCA should be held not to apply here, as the Relator ... should not be permitted to second-guess the FCC's determination of its own rules after such an extensive information[-]gathering process where Defendants' competitors had the right [ ], but declined, to object.[111]

This argument could be construed at least three different ways—either Taylor cannot state a claim under the FCA because: (1) the Act is "preempted" by the FCC's remedial scheme;[112] (2) false statements

---

**107.** The first two elements have been discussed in detail in Part II.B.1.

**108.** *United States v. Q Int'l Courier, Inc.*, 131 F.3d 770, 773 (8th Cir.1997); *see also Kennard v. Comstock Res., Inc.*, 363 F.3d 1039, 1048 (10th Cir.2004) ("Pursuant to § 3729(a)(7), Relators are required to allege that [defendant] had 'an existing, legal obligation to pay or transmit money or property to the Government' and that [defendant] submitted false statements or records to conceal, avoid, or decrease that obligation.") (quotation marks omitted); *Capella*, 2000 WL 1336487, at *11 ("A potential penalty [ ] does not suffice to state a subsection (a)(7) claim because such potential penalties do not constitute an existing obligation."); *United States ex rel. Drake v. Norden Sys., Inc.*, No. 94 Civ. 963, 2000 WL 1336497, at *11 (D.Conn. Aug. 24, 2000) ("The dispositive element is a presently existing obligation to pay the government."). *But cf. United States v. Pemco Aeroplex, Inc.*, 195 F.3d 1234, 1237 n. 2 (11th Cir.1999) ("The government asks us to hold that a potential obligation would satisfy the requirements of § 3729(a)(7), but we do not reach that issue because the obligation here is so clearly an existing obligation.").

**109.** *See* CWT Defs. Mem. at 44.

**110.** *Id.* at 45–46.

**111.** *Id.* at 46.

**112.** *See* Taylor's Memorandum of Law in Opposition to CWT Defendants' Motion to Dismiss ("Pl. CWT Opp.") at 40 (characterizing defendants' theory as a "preemption" argument); *see also* 6/17/04 Letter to the Court from Christopher Manning, counsel for Taylor (same); 6/30/04 Letter to the Court from Ethan Posner, counsel for all defendants except Gabelli (appearing to accept this characterization).

I note using the term "preemption" in this setting is somewhat unusual. *See Trollinger v. Tyson Foods, Inc.*, 370 F.3d 602, 608 (6th Cir.2004) ("To say that federal courts lack jurisdiction to hear a claim under a federal act [ ] because it is 'preempted' by another federal act [ ] is not a natural use of the term 'preemption.' As federal courts generally use the term, preemption does not describe the effect of one federal law upon another; it refers to the supremacy of federal law over state law when Congress, acting within its enumerated powers, intends one to displace the other.").

made to the FCC in auction applications are not legally cognizable under the Act;[113] or (3) that the FCC (not this Court) should resolve those issues peculiarly within its expertise.[114]

▆▆▆▆ It is "well-established" that the "preclusion of one federal statute by another [is strongly disfavored,] absent express manifestations of preclusive intent."[115] "Courts 'are not at liberty to pick and choose among congressional enactments, and when two statutes are capable of co-existence, it is the duty of the courts,

absent a clearly expressed congressional intention to the contrary, to regard each as effective.' "[116] This is consistent with the " 'principle of statutory construction that repeals by implication are not favored.' "[117] Thus, it has been observed that "[r]edundancies across statutes are not unusual events in drafting, and so long as there is no 'positive repugnancy' between two laws ... a court must give effect to both."[118] At the same time, federal statutory claims may be "unavailable because another more detailed statute evidences Congressional

---

**113.** This argument is addressed in Part III.A.

**114.** The third possible variation of defendants' argument is premised on the "primary jurisdiction" doctrine, which the Seventh Circuit has described as "really two doctrines." *Arsberry v. Illinois*, 244 F.3d 558, 563 (7th Cir.2001). The *Arsberry* court explained:

In its central and original form, in which it is more illuminatingly described, however, as "exclusive agency jurisdiction," it applies only when, in a suit involving a regulated firm but not brought under the regulatory statute itself, an issue arises that is within the exclusive original jurisdiction of the regulatory agency to resolve, although the agency's resolution of it will usually be subject to judicial review. When such an issue arises, the suit must stop and the issue must be referred to the agency for resolution. If the agency's resolution of the issue does not dispose of the entire case, the case can resume subject to judicial review of that resolution along whatever path governs review of the agency's decisions, whether back to the court in which the original case is pending or, if the statute governing review of the agency's decisions designates another court, to that court.

[P]rimary jurisdiction is sometimes defined quite differently, as a doctrine that allows a court to refer an issue to an agency that knows more about the issue, even if the agency hasn't been given exclusive jurisdiction to resolve it.... [But cases] in which a court refers an issue to an agency because of the agency's superior expertise ... rather than because of the agency's jurisdiction, are not felicitously described as cases of primary jurisdiction. They are akin to those *Burford* abstention cases that ... con-

cern arcane regulatory issues; or cases in which the court solicits an amicus curiae brief from an interested agency; or cases in which the court has in effect appointed the agency to be a special master.... In such cases, either court and agency have concurrent jurisdiction to decide an issue, or only the court has the power to decide it, and seeks merely the agency's advice. (In the core of the doctrine, in contrast, the court has jurisdiction of the case, but the agency of the issue.)

*Id.* at 563–64 (citations omitted); *see also TCG New York, Inc. v. City of White Plains*, 305 F.3d 67, 74 (2d Cir.2002), *cert. denied*, 538 U.S. 923, 123 S.Ct. 1582, 155 L.Ed.2d 314 (2003). Defendants, many of whom are armed with new counsel, have recently moved to stay this action pending referral of two key issues to the FCC, relying to some degree on the doctrine of primary jurisdiction. Accordingly, I reserve discussion of this issue until that motion is decided.

**115.** *United States v. Sforza,* 326 F.3d 107, 111 (2d Cir.2003).

**116.** *Id.* (quoting *Local 1814, Int'l Longshoremen's Ass'n, AFL–CIO v. New York Shipping Ass'n,* 965 F.2d 1224, 1237 (2d Cir.1992)).

**117.** *United States v. General Dynamics Corp.,* 19 F.3d 770 (2d Cir.1994) (quoting *Radzanower v. Touche Ross & Co.,* 426 U.S. 148, 154, 96 S.Ct. 1989, 48 L.Ed.2d 540 (1976)).

**118.** *Connecticut Nat'l Bank v. Germain,* 503 U.S. 249, 254, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992); *accord General Dynamics Corp.,* 19 F.3d at 774.

intent to pre-empt the more general claim which relates to conduct for which the other statute provides a detailed remedy."[119]

Notably, courts have been "reluctant to find pre-emption of the [FCA] even where other laws provided closely related regulation and remedies."[120] Indeed, the legislative history indicates that Congress specifically contemplated the use of the Act to address regulatory violations.[121]

 It is thus not surprising that defendants fail to demonstrate that Congress, by granting the FCC the authority to construct a remedial scheme to address violations of FCC regulations, intended to "preempt" remedies under the FCA.[122] Defendants' argument is premised primarily upon those provisions of the Federal Communications Act of 1934 authorizing the FCC to (1) grant and deny license applica-

tions and (2) impose administrative sanctions for "false statements knowingly made either in the application or in any statement of fact which may be required . . . [under] this title."[123] Defendants offer nothing from the legislative history to suggest that Congress meant for the FCC regulations to supersede the FCA. Moreover, defendants have not shown that the FCC's "remedies" for the submission of fraudulent statements (and the omission of information in contravention of its regulations) are more "detailed" than those provided for in the FCA. But even if the FCC's remedial scheme provides for a more "specific" remedy than does the FCA, there is no apparent conflict between the federal regulations and the Act. As such, there is no basis upon which to conclude that Congress intended to preclude FCA claims by authorizing the FCC to

119. *United States ex rel. Fallon v. Accudyne Corp.*, 880 F.Supp. 636, 639 (W.D.Wis.1995) (making this observation, but ultimately rejecting the defendant's argument that various environmental statutes underlying relator's complaint were preempted by the FCA).

120. *Id.* (citing cases); *see also General Dynamics Corp.*, 19 F.3d at 777 (concluding that, as a general rule, the Anti–Kickback Act "does not preempt remedies of the United States under the FCA"); *United States v. Foster Wheeler Corp.*, 447 F.2d 100 (2d Cir.1971) (finding that FCA claims are not preempted by the Truth–In–Negotiation Act); *Incorporated Village of Island Park*, 888 F.Supp. at 442 (finding that FCA claims are not preempted by the Fair Housing Act).

121. *See* S.Rep. No. 99–345, *reprinted in* 1986 U.S. Code Cong. and Admin. News at 5274 ("A false claim [under the Act] may take many forms, the most common being a claim for goods or services not provided, or provided in violation of . . . statute[ ] or regulation.").

122. *See* CWT Defs. Mem. at 45 (citing 47 U.S.C. §§ 151, 154(j), 155, 303(r), 309, 312(a)(1)). These sections are not particularly illuminating as to congressional intent.

Many describe the FCC in general terms, *i.e.*, section 151 sets forth the purposes for creating the FCC (to regulate interstate and foreign commerce); 154(j) outlines FCC proceedings ("The [FCC] may conduct its proceedings in such manner as will best conduce to the proper dispatch of business and to the ends of justice."); 155 explains, among other matters, the functions, organization, and meetings of the FCC. *See* 47 U.S.C. §§ 151, 154(j), 155. Others enumerate the powers and duties of the FCC. For example, section 303(r) confers authority to the FCC "from time to time, as public convenience, interest, or necessity requires" to, in relevant part, "[m]ake such rules and regulations and prescribe such restrictions and conditions, not inconsistent with law, as may be necessary to carry out the provisions of this chapter." 47 U.S.C. § 303(r). Obviously, these sections of the Federal Communications Act do not expressly or impliedly address the issues of preemption or primary jurisdiction.

123. 47 U.S.C. § 312(a)(1); *see also* 47 U.S.C. § 309. Interestingly, neither section creates a private right of action permitting a plaintiff to enforce these provisions. *See, e.g., Rokus v. American Broad. Co.*, 616 F.Supp. 110, 113 (S.D.N.Y.1984).

grant relief for violations of FCC regulations. Accordingly, claims under the FCA are not "preempted" by the FCC's remedial scheme.

### A. Motion to Dismiss for Failure to State a Claim
#### 1. Action Against Unsuccessful Bidders

Defendants argue that Taylor cannot bring an FCA action against those entities who unsuccessfully bid for FCC licenses in the various auctions. They reason that the mere submission of a short-form application, without more, does not constitute "making a claim," seeking payment from the Government. Taylor counters that the word "claim" should be construed liberally to encompass the bidders' fraudulent conduct.[124]

 It has long been observed that the FCA was not intended to redress "every kind of fraud practiced on the Government."[125] In accordance with this notion, a defendant's false certification of adherence to a statute or regulation, standing alone, cannot form the basis for an FCA claim. Rather, such certification of statutory/reg-

ulatory compliance must be a prerequisite to governmental payment.[126] In other words, where a defendant's "alleged noncompliance would not have influenced the government's decision to pay," the failure to comport with the regulations cannot serve as the basis for an FCA claim.[127]

Taylor's assertion that the term "claim" is interpreted broadly to reach fraudulent *conduct* in addition to false statements is consistent with these observations. Whether a defendant's conduct falls within the ambit of a "claim" depends on whether these actions are linked to a demand for some form of payment from the Government.[128] This is evident from the language of the Act, which specifically defines a "claim" to cover any "request or demand ... for money."[129] But it does not follow that "claims" cover false certifications made in connection with mere *bids* presented to the FCC. A bid, by its very nature, does not request or demand monetary compensation.[130] It is one step removed from a request or demand for money—an offer made in the hope of acceptance.[131] Thus, even assuming that the

---

**124.** *See* Pl. CWT Opp. at 45–46. Taylor also contends that he is not required to allege that the Government sustained monetary damages to survive a motion to dismiss. As discussed in the foregoing section, this may be true: If the relator proves that the Government sustained actual damages, defendants may be liable for treble damages; if not, then the civil penalty alone is available to redress the injury. *See* Part II.B. But this is beside the point. Taylor's argument fails because it conflates two related, but distinct concepts—actual damages and making a "claim" to the Government. Even if a relator is not required to allege that the Government actually sustained damages, he must still aver that the defendants made a request or demand for payment.

**125.** *United States v. McNinch,* 356 U.S. 595, 599, 78 S.Ct. 950, 2 L.Ed.2d 1001 (1958).

**126.** *See Mikes,* 274 F.3d at 697–98.

**127.** *Id.* at 697.

**128.** *See Incorporated Village of Island Park,* 888 F.Supp. at 439.

**129.** 31 U.S.C. § 3729.

**130.** *See* Boese, *supra* note 72, § 2.02[E], at 2–72.3–72.4 (2004–1 Supp.) ("A bid is not a 'claim' under the False Claims Act because it does not request the payment of money. Of course, if a contract is awarded on the basis of a false bid, if claims are subsequently made under the contract, and if the falsity causes the government to pay more than it otherwise would have paid on the claims, liability under the Act may be found.").

**131.** *Cf. United States v. Van Oosterhout,* 96 F.3d 1491, 1494 (D.C.Cir.1996) ("It is generally accepted that the false application for a

unsuccessful bidders falsely certified compliance with FCC regulations on their short-form applications, they did not "make" (or cause or conspire to be presented) a "claim" within the meaning of the FCA.

Accordingly, Taylor has not pled actionable claims under sections 3729(a)(1)-(2) against the unsuccessful bidders and those defendants named solely due to their alleged relationship to these bidders. Because "[a] claim for civil conspiracy is generally not viable without the commission of an underlying wrongful act," Taylor's conspiracy allegations under section 3729(a)(3) also fail.[132] Finally, because these defendants never incurred an obligation to the Government and thus had no payment to avoid, conceal, or decrease, Taylor has not pled facts sufficient to support a reverse false claim under section 3729(a)(7).

### 2. Action Against All Other Defendants

For the reasons set forth in Part III.A.1, the unsuccessful bidders and defendants sued only because of their relationship to those bidders are dismissed from this action. Accordingly, the discussion that follows relates *only* to those bidders *awarded* licenses in Auctions 5, 11, 14, 17, 22, 23, 26, 30, 33, and 35 and the defendants connected by to those *successful* bidders.

### a. Count One—Sections 3729(a)(1)-(2)

■ Defendants argue that the Complaint does not state a claim under sections 3729(a)(1)-(2) because Taylor has not alleged that defendants made any "false or fraudulent statements."[133] In particular, defendants contend that: (1) at best, Taylor's allegations amount to a disagreement with defendants' "legal determination ... as to the issue of *de facto* control for purposes of whether the Bidding Parties qualified for 'small' and 'very small' business status" and (2) because they "made all required disclosures of objective facts at issue in the Complaint ... there is no false or fraudulent statement supporting an FCA claim."[134]

Although it is true that "[e]xpressions of opinion, scientific judgments, or statements as to conclusions about which reasonable minds may differ cannot be false" under the FCA, defendants' conduct, as pled, amounts to more than just "bad math" or "faulty calculations."[135] Accepting the factual allegations contained in the Complaint as true, defendants *deliberately* violated FCC regulations by concealing relevant financial relationships and falsely

guaranteed loan by the debtor establishes only an 'inchoate' violation of the Act that does not ripen into a claim actionable under the statute until a later event of legal consequence between the lender and the government."); *United States ex rel. Pentagen Techs. Int'l Ltd. v. Caci Int'l Inc.*, No. 96 Civ. 7827, 1997 WL 473549, at *11 n. 2 (S.D.N.Y. Aug. 18, 1997) ("Once the defendant has entered a contract, all its false statements pertaining to that contract arguably pave the way for false claims of payment. [But where] fraudulent conduct fails to win the contract, imposing liability would contravene basic standing doctrine."), *aff'd*, 172 F.3d 39 (unpublished decision) (2d Cir.1999).

**132.** *United States ex rel. Coppock v. Northrup Grumman Corp.*, No. 98 Civ. 2143, 2003 WL

21730668, at *14 n. 17 (N.D.Tex. July 22, 2003) (citing cases); *see also id.* (citing *Halberstam v. Welch*, 705 F.2d 472, 479 (D.C.Cir. 1983) for the proposition that "liability for civil conspiracy depends on performance of some underlying tortious act, the conspiracy is not independently actionable; rather, it is a means for establishing vicarious liability for the underlying tort.").

**133.** CWT Defs. Mem. at 38.

**134.** *Id.*

**135.** *United States ex rel. Roby v. Boeing Co.*, 100 F.Supp.2d 619, 625 (S.D.Ohio 2000), *aff'd*, 302 F.3d 637 (6th Cir.2002).

certifying that they were eligible for federal monies.[136] The FCC regulations mandate that auction participants make detailed disclosures relating to their eligibility to both (1) participate in auctions in which licenses reserved for small businesses will be awarded and (2) receive federal discounts because of their status as small businesses.[137] Taylor asserts that defendants purposefully sidestepped these regulations in an effort to induce the Government to give them money. At this early stage in the proceedings, these allegations are sufficient to satisfy the "false or fraudulent statement" element of FCA claims.

Defendants' second argument—that the bidders made all of the required disclosures on their application forms and therefore made no false statements—similarly fails. It is enough, at this point, that Taylor alleges that defendant bidders falsely certified (or caused/conspired with others to falsely certify) that they were small or very small businesses, entitled to federal discounts. This certification is a false or fraudulent statement sufficient to sustain a claim under the Act. Thus, even if defendant bidders otherwise truthfully disclosed the information required by the FCC regulations (which Taylor claims that

they did not), they are still alleged to have proffered (or caused/conspired to be proffered) fraudulent statements in contravention of the regulations. Defendants may ultimately disprove these allegations; however, for purposes of this motion, Taylor's allegations are sufficient.

In sum, Taylor has adequately pled the elements necessary to state a claim under sections 3729(a)(1) and (a)(2). He has averred that defendants: (1) made or caused others to make a claim to the Government (false statements in their applications claiming eligibility for federal bidding credits),[138] (2) that is false or fraudulent (in contravention of the FCC's certification and disclosure requirements), (3) knowing of its falsity, (4) seeking payment from the federal treasury (bidding credits).[139] In the alternative, Taylor has alleged that defendants: (1) created, used, or caused to be used, a record or statement to the Government (documentation submitted in support of the claims); (2) that is false or fraudulent, (3) knowing of its falsity, (4) to get a false or fraudulent claim paid or approved by the government.

### b. Count Two—Section 3729(a)(3)

Defendants contend that Taylor's civil conspiracy claims must also be dismissed

---

**136.** *See, e.g.,* Compl. ¶¶ 178, 191, 215, 221, 224, 254, 268, 270, 362.

**137.** *See* 47 C.F.R. ¶¶ 1.17, 1.65, 1.2105(a)(2)(iv), 1.2110, 1.2112.

**138.** In their motion papers, the Rivgam defendants argue that "none of the Rivgam parties filed any application to bid for a spectrum license, bid on a license, submitted a request for payment to the government or made any statement to the United States to 'avoid, conceal, or decrease an obligation to the United States.' " Rivgam Defendants' Memorandum of Law in Support of Their Motion to Dismiss Relator's First Amended Complaint ("Rivgam Defs. Mem.") at 10. But the Act extends liability beyond those defendants who know-

ingly make direct claims on the U.S. Treasury based on fraudulent statements to those who *cause* false claims to be presented or *conspire* to make or present false of fraudulent claims. *See* 31 U.S.C. § 3729(a)(1)-(3); *see also* Taylor's Memorandum of Law in Opposition to the Rivgam Defendants' Motion to Dismiss at 27. Taylor alleges that these defendants were involved in this fraudulent scheme either as indirect owners (Rivgam LLC, Rivgam LMDS, Rivgam Inc.) or Gabelli-related entities (GFI, GGCP), and thereby participated by knowingly causing to be presented or conspiring to make false statements to defraud the Government. This is all that is required at this stage in the proceedings.

**139.** *Mikes,* 274 F.3d at 695.

due to his failure to allege that defendants made a false or fraudulent statement. However, for the reasons discussed in Part III.A.2.a, this argument fails. In all other respects, Taylor has adequately alleged that defendants conspired to get fraudulent claims allowed by the Government. Additionally, the bidder defendants affirmatively acted to get false claims paid by certifying that they were eligible to receive discounts.

### c. Count Three—Section 3729(a)(7)

 A defendant who makes a false statement to avoid or decrease a preexisting obligation to pay money to the Government may be liable under section 3729(a)(7). Taylor contends that defendants made or caused to be made false statements, reports, and material omissions that decreased their obligation to pay for their spectrum licenses.[140] Specifically, he asserts that the winning bidders' obligation to pay attached at the close of the spectrum auctions. Thus, when the successful bidders falsely certified in their long-form applications that they were eligible for federal discounts, they had a preexisting duty to pay for the licenses.[141] Their false statements thus reduced their obligation to pay.

The problem with this argument is that the reduction in money owed to the Government in this scenario *is* the very same money that the defendants will procure from the U.S. Treasury (as a government payment), according to Taylor's claims under either section 3729(a)(1) and (a)(2).[142]

---

140. *See* Pl. CWT Opp. at 37 (citing Compl. ¶¶ 199, 221, 293–99).

141. *See id.* at 39 (noting that defendants "had a preexisting duty—contractual, statutory, and regulatory—to pay for spectrum licenses acquired at auction" and contending that their fraudulent applications did not *create* this obligation, but merely "*decreased* the amount of that underlying payment obligation").

Whether Taylor has asserted reverse false claims depends, in part, on the nature of defendants' obligation to pay the Government—a contingent, speculative, or potential obligation is not actionable. *See, e.g., Q Int'l Courier,* 131 F.3d at 773; *Kennard,* 363 F.3d at 1048. Thus, not surprisingly, defendants' arguments focused on the nature of this "duty" to pay, arguing that Taylor failed to plead cognizable reverse false claims because "the allegedly false statements or omissions in [their] FCC applications pre-dated (and ultimately created) [their] obligation to pay the government for the public spectrum licenses upon which Relator now bases his FCA claim." CWT Defs. Mem. at 44; *see also* Reply Memorandum of Law in Support of CWT Defendants' Motion to Dismiss Relator's First Amended Complaint ("CWT Defs. Reply") at 19–20. In other words, defendants argued that their duty to pay had not yet "ripened" when they submitted their long-form applications. *See id.* at 20.

But, in light of the legal principles governing auctions, defendants' argument lacks merit. Although it is possible that winning bidders will not actually receive the licenses due to, for example, disqualification or default, the Second Circuit has held that a successful bidder's obligation attaches at the close of the auction. *See In re NextWave Pers. Communications, Inc.,* 200 F.3d 43, 57 (2d Cir.1999). In that case, the Second Circuit found that under both the FCC's interpretation and federal common law, "the binding obligation to pay the full bid price attaches to the winning bidder 'upon acceptance of the high bid.'" *Id.; see also id.* at 60; *id.* at 62 ("True, there appears to be an element of discretion in the FCC's decision to grant the [C–Block licenses] conditionally, pending NextWave's compliance with statutory requirements. However, that conditional grant was temporary, and the FCC had no power to waive the statutory requirements permanently. Moreover, it was a temporary discretionary *approval;* the FCC had no authority to *reject* NextWave's bid as a matter of discretion.") (citation omitted).

142. Another way of conceptualizing this is as follows. Assume that a winning bidder owes "X" to the Government for spectrum licenses. By certifying eligibility for bidding credits, the bidder owes X minus D, where "D" is the discount. Under the section 3729(a)(1) and (2) claims, the bidders falsely certify they are

In other words, Taylor seeks to recover under two theories, that defendants falsely certified eligibility to: (1) receive federal monies and (2) decrease their contractual obligations. Close examination of these claims leads to the inescapable conclusion that they are redundant—two ways of describing the same transaction. Because Taylor's allegations state a claim under sections 3729(a)(1) and (2), they cannot also form the basis for a claim under subsection (a)(7). Accordingly, Count Three of the Complaint is dismissed.

### B. Motion to Dismiss for Failure to Plead Fraud with Particularity

■ Defendants urge dismissal of this action for what they characterize as Taylor's failure to comport with the heightened pleading requirements of Rule 9. Defendants argue that Taylor has not identified those statements that he contends were fraudulent. But for the reasons set forth in Part III.A.2.a, Taylor has identified the false or fraudulent statements with sufficient particularity. This is not "a situation where only a general scheme of fraud was alleged that *might* have resulted in the submission of false claims. Here, the fraudulent scheme was the submission of the claims themselves."[143] That is, Taylor has alleged that defendants fraudulently submitted (or caused or conspired to present) false claims or records (in the bidding applications).

Defendants further object to the manner in which the Complaint indiscriminately groups defendants together "into one wrongdoing monolith, without specifying the alleged wrongdoing of each Defendant."[144] I note that courts have suggested that Rule 9 may be relaxed where the fraudulent scheme is so complex that offering detailed accounts of each individual's role in the fraud is virtually impossible.[145] But even setting this aside, Taylor's Complaint adequately provides defendants with notice as to the claims asserted against them.[146] It satisfies the "who," "what,"

---

small businesses eligible for the discount, thereby eliciting a payment equal to "D" *from the Government.* But under section 3729(a)(7), the bidders are making the same false statement to decrease their payment obligation owing *to the Government* in an amount equal to "D." It is quite clear that "D" is the same whether the relator casts it under section 3729(a)(1)-(2) or recasts it as a reverse false claim.

**143.** *In re Cardiac Devices Qui Tam Litig.*, 221 F.R.D. at 337.

**144.** CWT Defs. Mem. at 51 (quotation marks and citation omitted); *see also* CWT Defs. Reply at 23; Rivgam Defs. Mem. at 11–12; Rivgam Defendants' Memorandum of Law in Support of Their Motion to Dismiss Relator's First Amended Complaint at 7. In support of their argument, the CWT defendants cite, for instance, *United States ex rel. Branhan v. Mercy Health System of Southwest Ohio*, 188 F.3d 510 (6th Cir.1999) (unpublished table decision) (dissenting opinion). In addition to lacking precedential value, the *Branhan* dis-

sent does not stand for the proposition that a plaintiff must allege in detail every aspect of a defendant's participation in an alleged fraud. "Rather, a plaintiff alleging fraud must establish a connection between fraudulent acts or statements and each defendant, or must establish facts that inform each defendant of its participation in the fraud." *Id.* Taylor has satisfied this standard as to all defendants by alleging each defendant's relationship to a bidding entity, and, by implication, to the false statement proffered by that bidder.

**145.** *See In re Cardiac Devices Qui Tam Litig.*, 221 F.R.D. at 333, 337.

**146.** Defendants argue that the averments relating to T. Gibbs Kane are inadequate because his liability is premised solely on his spousal relationship with Victoria Kane. *See* CWT Defs. Mem. at 47–48 (moving to dismiss the Complaint as to Mr. Gibbs). However, the Complaint alleges that T. Gibbs Kane served as an officer of East/West Communications and as a "control member" of Aer Force

"where," "when," and "how" requirements for pleading fraud in this circuit and puts each defendant on notice as to the claims asserted against it.

The "who" are the successful bidders and those defendants connected to them (as owners; related, predecessor, or successor entities; officers; or Gabelli-related entities) who presented (or caused or conspired to present) the false records or claims. The "what" is the false certifications of eligibility for federal monies submitted in connection with auction applications. The "where" and "when" is the place/time where/when these claims and records were filed. The "how" is addressed by those allegations relating to defendant bidders' certification and submission of false records/claims of small business status and eligibility for federal bidding credits.

## IV. CONCLUSION

For the foregoing reasons, the CWT defendants' motion to dismiss is granted in part and denied in part. The action is dismissed against those defendants named only by virtue of their relationship to, or status as, bidders who were *not* granted licenses. Count Three of the Complaint, alleging reverse false claims, is also dismissed. The Rivgam defendants' and Gabelli's motions to dismiss are denied. The Clerk of the Court is directed to close these motions [Nos. 24, 25, 26, 27, and 28 on the docket sheet].

Inc. *See* Compl. ¶ 67. For purposes of the instant motion, these allegations are sufficient to notify Mr. Gibbs of his connection to the fraudulent scheme. Accordingly, dismissal of the action against him is not warranted.