UNITED STATES OF AMERICA
ex rel. R.C. TAYLOR III,
Plaintiff–Relator,

v.

Mario GABELLI, Lynch Corp., Lynch Interactive Corp., Lynch PCS Communications Corp., Lynch PCS Corporation A, Lynch PCS Corporation B, Lynch PCS Corporation C, Lynch PCS Corporation D, Lynch PCS Corporation E, Lynch PCS Corporation F, Lynch PCS Corporation H, Lynch Paging Corp., Fortunet Wireless Communications Corp., Aer Force Communications, Inc., Aer Force Communications LP, New England Wireless Communications, LP, New England Wireless Communications, Corp., Southeast Wireless Communications, LP, Southeast Wireless Communications Corp., Fortunet Wireless Communications, LP, Fortunet Communications LP, High Country Communications, LP, High Country Communications Corp., Aer Force Communications B, LP, Aer Force Communications II, LP, Rivgam Communicators, Inc., Gamco Investors, Inc., Gabelli Funds, Inc., Bal/Rivgam LLC, Rivgam Communicators, LLC, Gabelli Group Capital Partners, Inc., ARF Communications B, Inc., East/West Communications Inc., ABC–LMDS LLC, BCDJMS LLC, BCK/Rivgam LLC, Rivgam LMDS LLC, Beta Communications LLC, Theta Communications LLC, Theta Communications I, LLC, Theta Communications II, LLC, Theta Communications IA LLC, PTPMS Communications LLC, PTMPS II Communications LLC, Betapage

Communications LLC, Sunshine PCS Corp., Alfred Angelo, Karen Johnson, Victoria Kane, James Balitsos, Marie Balitsos, T. Gibbs Kane, Nara Cadorin, Clarence Davis, Kathleen Sugarman, Gary Sugarman, Katherine Stafford, Trent Tucker, Keith Mantle, Kuni Nakamura, Jennifer Caiati, Nancy Vanneck, and Thomas Wilson, Defendants.

No. 03 Civ. 8762(SAS).

United States District Court,
S.D. New York.

Sept. 14, 2004.

Brendan V. Sullivan, Jr., Paul B. Gaffney, Christopher Nicholas Manning, Williams & Connolly LLP, Washington, DC, Erika Kelton, Phillips & Cohen, Washington, DC, Neil V. Getnick, Richard J. Dircks, Getnick & Getnick, New York, NY, for Plaintiff–Relator.

Robert I. Bodian, Seth R. Goldman, Mintz Levin Cohn Ferris Glovsky and Popeo, PC, New York, NY, R. Robert Popeo, Mintz Levin Cohn Ferris Glovsky and Popeo, PC, Boston, MA, for Defendant Mario Gabelli.

Ethan M. Posner, Sarah L. Wilson, Christopher M. Denig, Michael C. Boteler, Covington & Burling, Washington, DC, for Defendants Other than Gabelli.

### OPINION AND ORDER

SCHEINDLIN, District Judge.

By Order dated October 2, 2003, the District Court for the District of Columbia transferred to the Court this qui tam action, alleging a conspiracy to defraud the United States (the "Government") through abuse of the Federal Communication Commission's ("FCC" or the "Commission") public bidding procedure for wireless telecommunications licenses.[1] In connection with their motion to transfer venue, defendants also sought dismissal of this action pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b). These motions were denied in part and granted in part by this Court's Opinion and Order of July 29, 2004 ("July 29 Order").[2] Defendants now request a stay of these proceedings pending referral of two issues to the FCC.[3] Specifically, these issues are whether: (1)

defendant minority investors "exercised *de facto* control over the small businesses and their owners who bid on certain telecommunications licenses" and (2) these "bidders intentionally failed to disclose in their auction applications and statements the assets and revenues of minority investor [d]efendants, thereby violating FCC regulations and policies and fraudulently inducing the FCC to award the licenses to them."[4] For the following reasons, this motion is denied in its entirety.

### I. BACKGROUND

The July 29 Order described in detail the underlying facts and procedural history of this case. I will not repeat that here, except to summarize the facts relevant to this motion.

Taylor, suing as a qui tam relator, brings this action against various individual and corporate defendants alleged to have participated in a fraudulent scheme organized largely by defendant Mario Gabelli.[5] Taylor filed the original complaint in this action under seal in February 2001, serving it upon the Government shortly

---

**1.** *See United States ex rel. Taylor v. Gabelli,* No. 01 Civ. 333 (D.D.C. Oct. 2, 2003). This case was brought pursuant to the federal False Claims Act ("FCA" or the "Act"), 31 U.S.C. § 3729 *et seq.* The Second Amended Complaint ("Compl.") alleges claims under sections 3729(a)(1)-(2), (3), (7). *See* Compl. ¶¶ 360–372. The "reverse false claims," *see* 31 U.S.C. § 3729(a)(7), were dismissed by this Court on July 29, 2004. *See United States ex rel. Taylor v. Gabelli,* No. 03 Civ. 8762, 2004 WL 1719357, at *14 (S.D.N.Y. July 29, 2004).

**2.** *See Taylor,* 2004 WL 1719357, at *15. In the July 29 Order, I noted that one of defendants' arguments favoring dismissal could be construed to invoke the doctrine of primary jurisdiction. *See id.* at *11 n. 114. Nonetheless, because defendants moved separately for a stay under the primary jurisdiction doctrine, I reserved discussion of the issue pending full briefing of the motion.

**3.** In particular, all defendants except for Mario Gabelli filed a motion to stay pending referral to the FCC. Mario Gabelli then joined in that motion.

**4.** Memorandum of Law in Support of Defendants' Motion to Stay Pending Referral of Two Issues to the FCC ("Defs.Mem.") at 1.

**5.** According to Taylor, Gabelli and Gabelli-related entities created a number of "sham" bidding entities. These organizations were purportedly established for the purpose of "acquir[ing] federally discounted licenses as investments to be later sold for profit in the after-market," and not for the legitimate objective of "develop[ing] or offer[ing] spectrum services under the acquired licenses, or to operate actual business operations." Compl. ¶ 110. Gabelli also drew social and business acquaintances into this scheme to serve as officers or control members of bidding or owner companies. *See id.* ¶ 113.

thereafter.[6] At that point, the Government could have assumed "primary responsibility for prosecuting the action," enabling it to, *inter alia,* dismiss the action "notwithstanding [Taylor's] objections." [7] The Government could also have elected to "pursue its claim through any alternate remedy available to [it], including any administrative proceeding to determine a civil money penalty." [8] Approximately eight months later, however, the Government opted instead to decline to intervene in the action; permit Taylor to conduct the action on behalf of the "real party in interest," the Government; and reserve the right to intervene (for good cause) at a later stage in these proceedings.[9]

## A. Defendants' Alleged Fraud

The gravamen of the Complaint is that defendants directly (as "sham" bidding entities) or indirectly (as owners and/or officers) defrauded the federal government by, among other things, falsely certifying (or causing to be falsely certified) to the FCC that Gabelli-related bidders qualified as "small" or "very small" businesses.[10]

These false misrepresentations, made in connection with applications submitted for purposes of Auctions 5, 11, 14, 17, 22, 23, 26, 30, 33, and 35, induced federal payment to successful bidders in the form of bidding credits.[11] These auctions involved various types of licenses, including those in restricted-eligibility blocks (*e.g.,* Auction 5 involved bidding for broadband personal communications services ("PCS") Block–C licenses).

## B. The Auction Process and the FCC

### 1. Auction Procedures

In 1993, Congress authorized the use of competitive bidding to award spectrum licenses [12] and directed the FCC, in designing auction procedures, to "promot[e] economic opportunity and competition and ensur[e] that [ ] innovative technologies are readily accessible to the American people by avoiding excessive concentration of licenses and by disseminating licenses among a wide variety of applicants, including small businesses." [13] Accordingly, the FCC created various incentives for small business participation in the multiple-

---

**6.** *See* 31 U.S.C. § 3730(b)(2) ("The complaint shall be filed in camera, shall remain under seal for at least 60 days, and shall not be served on the defendant until the court so orders. The Government may elect to intervene and proceed with the action within 60 days after it receives both the complaint and the material evidence and information.").

**7.** *Id.* § 3730(c)(2)(A).

**8.** *Id.* § 3730(c)(5).

**9.** 11/8/02 Letter from Gordon A. Jones, counsel for the Government, Ex. 1 to 7/7/04 Declaration of Christopher N. Manning ("Manning Decl."), counsel for Taylor, in Opposition to Defendants' Motion to Stay Pending Referral of Two Issues to the FCC at 1–2; *see also* 31 U.S.C. § 3730(b)(4).

**10.** *See* Compl. ¶¶ 175–178, 190, 216, 249–254, 269, 293. Additionally, defendants purport-

edly, through other false and fraudulent representations, omissions, and records, induced the FCC to award restricted-eligibility licenses and discounts to defendant bidding entities. *See id.* ¶ 293. For instance, Taylor alleges that defendants knowingly failed to disclose Gabelli and Gabelli-related entities' control over and affiliation with defendant bidders and hence improperly excluded the assets and revenues of these companies. *See, e.g., id.* ¶¶ 270, 274–279.

**11.** These statements provided Gabelli-related bidders with another advantage; they were permitted to participate in auctions restricted to relatively small businesses.

**12.** *See* Omnibus Budget Reconciliation Act of 1993, Pub.L. No. 103–66, amending the Communications Act of 1934; *see also* 47 U.S.C. § 309(j)(1).

**13.** 47 U.S.C. § 309(j)(1).

round auction process designed to award broadband PCS licenses.[14] For example, the Commission restricts bidding in some auction blocks to "small businesses and other designated entities with total assets and revenues below certain levels."[15] In addition, bidders that qualify as "small" or "very small" businesses may receive bidding credits, in the form of percentage discounts applied to the high bid amounts for licenses.

Although the discounts offered and definition of "small" or "very small" business vary by auction, each auction involves similar steps. *First*, potential bidders must file a "short-form" application (Form 175), certifying, *inter alia*, eligibility for federal bidding credits and status as a qualified designated entity.[16] *Second*, following the close of each auction, winning bidders have ten days to submit a "long-form" application (Form 600 series). This form requires applicants to provide and certify the accuracy of detailed information, including their entitlement to bidding credits and any agreements into which they have entered relating to the licenses.[17] Any applicant who fails to submit a timely long form or is otherwise defaulted or disqualified from receiving the license is subject to penalties under section 24.704(a)(2) of the federal regulations.[18]

For purposes of both forms, applicants must comply with the disclosure require-

**14.** The FCC identified a lack of access to capital as the primary obstacle to the success of relatively small businesses in obtaining spectrum licenses. *See, e.g., Implementation of Section 309(j) of the Communications Act—Competitive Bidding*, Fifth Report and Order, 9 F.C.C.R. 5532, 5537 (1994) ("The record clearly demonstrates that the primary impediment to participation by designated entities is lack of access to capital."). Accordingly, the Commission promulgated regulations intended to mitigate this difficulty. *See, e.g., Implementation of Section 309(j) of the Communications Act—Competitive Bidding*, Fifth Memorandum Opinion and Order, 10 F.C.C.R. 403, 410 (1994) ("In particular, we made bidding credits and installment payment options available to those ... designated entities that, according to the record of this proceeding, have demonstrated historic difficulties accessing capital."). For instance, in 1995, to assist small entities in attracting capital, the Commission extended to qualifying small businesses a benefit previously given only to businesses owned by women or minorities, *i.e.*, to have a single, passive, non-voting investor with an interest as large as 49.9% as long as the applicant held 50.1%. *Implementation of Section 309(j) of the Communications Act—Competitive Bidding*, Sixth Report and Order, 11 F.C.C.R. 136, 146 (1995) (addressing modification of competitive bidding rules for C–Block licenses). Of course, the liberalization of FCC regulations increased the risk that large companies could exercise control over licenses intended for small businesses. *See Omnipoint Corp. v. Federal Communications Comm'n*, 78 F.3d 620, 638 (D.C.Cir.1996) (Wald, J., dissenting). The regulations thus reflect the tension between the need to grant small businesses access to capital and the desire to prevent large investors from controlling smaller entities. *See, e.g.*, 6/7/04 Affidavit of Christopher J. Wright in Support of Defendants' Motion to Stay Pending Referral of Two Issues to the FCC ("Wright Aff.") ¶ 37.

**15.** *Federal Communications Comm'n v. Nextwave Pers. Communications*, 537 U.S. 293, 296, 123 S.Ct. 832, 154 L.Ed.2d 863 (2003).

**16.** *See* 47 C.F.R. § 1.2105. Potential bidders must also attach an exhibit "certified as truthful under penalty of perjury, identifying all parties with whom the applicant has entered into partnerships, joint ventures, consortia or other agreements, arrangements or understandings of any kind relating to the licenses being auctioned, including any such agreements relating to the post-auction market structure." *Id.* § 1.2105(a)(2)(viii).

**17.** *See id.* § 1.2107(a), (c).

**18.** *See id.* § 24.704(a)(2).

ments set forth under section 1.2112 of the federal regulations, directing them to list:

(1) [T]he real party or parties in interest in the applicant or application, including a complete disclosure of the identity and relationship of those persons or entities directly or indirectly owning or controlling (or both) the applicant;

\* \* \* \* \* \*

(3) [I]n the case of a limited partnership, the name, address and citizenship of each limited partner whose interest in the applicant is 10 percent or greater . . .;

(4) [I]n the case of a general partnership, the name, address and citizenship of each partner, and the share or interest participation in the partnership;

(5) [I]n the case of a limited liability company, the name, address, and citizenship of each of its members whose interest in the applicant is 10 percent or greater;

(6) [A]ll parties holding indirect ownership interests in the applicant as determined by successive multiplication of the ownership percentages for each link in the vertical ownership chain, that equals 10 percent or more of the applicant, except that if the ownership percentage for an interest in any link in the chain exceeds 50 percent or represents actual control, it shall be treated and reported as if it were a 100 percent interest; and

(7) [A]ny FCC-regulated entity or applicant for an FCC license, in which the applicant or any of the parties identified in paragraphs [ (1) through (5) ], owns 10

percent or more of stock. . . . This list must include a description of each such entity's principal business and a description of each such entity's relationship to the applicant. . . . [19]

A bidder seeking the benefits associated with "small business" status must also provide the following information:

(i) [T]he names, addresses, and citizenship of all officers, directors, affiliates, and other controlling interests of the applicant. . . .;

(ii) [A]ny FCC-regulated entity or applicant for an FCC license, in which any controlling interest of the applicant owns a 10 percent or greater interest or a total of 10 percent or more of any class of stock, warrants, options or debt securities. This list must include a description of each such entity's principal business and a description of each such entity's relationship to the applicant; and

(iii) [S]eparately and in the aggregate the gross revenues . . . for . . . The applicant, its affiliates, its controlling interests, and affiliates of its controlling interests; and if a consortium of small businesses, the members comprising the consortium.[20]

### 2. Post–Auction Challenges

Interested parties seeking to challenge the long-form applications of successful bidders after the close of an auction are permitted to file petitions requesting denial of the licenses with the FCC.[21] These petitions must generally be filed within ten days after the FCC notifies the public that

---

19. *Id.* § 1.2112(a).

20. *Id.* § 1.2112(b)(1). In the supporting exhibits, the applicant must list and summarize: "[A]ll agreements or instruments . . . that support the applicant's eligibility as a small business under the applicable designated entity

provisions, including the establishment of de facto or de jure control." *Id.* § 1.2112(b)(2)(iii).

21. *See id.* § 1.2108(a).

the long forms are acceptable for filing.[22] If the petitioner raises "substantial and material issues of fact," the FCC will hold an evidentiary hearing on an "expedited basis."[23] The FCC's decision is appealable to the Court of Appeals for the District of Columbia Circuit.[24]

Following the grant of a license, the FCC has the authority to conduct audits of licensees "random[ly], on information, or on the basis of other factors."[25] Parties may also raise objections to the award of licenses by making an informal request to the FCC.[26] Among other bases, licenses may be challenged on the basis of an applicant's alleged failure to comport with regulations relating to investor control and/or exercising a lack of candor.

### a. Attribution Rules

The gross revenues and assets of any entity that holds interests in a potential bidder are attributable to that bidder if the entity directly or indirectly controls or is controlled by the bidder under the FCC's affiliation rules and controlling interest standard.[27] An entity is an "affiliate" of an applicant if it:

(A) Directly or indirectly controls or has the power to control the applicant, or

(B) Is directly or indirectly controlled by the applicant, or

(C) Is directly or indirectly controlled by a third party or parties that also controls or has the power to control the applicant, or

(D) Has an "identity of interest" with the applicant.[28]

Under the "controlling interest" standard, an entity that exercises either *de jure* (legal) or *de facto* (actual) control over an applicant is deemed to control that appli-

---

22. *See id.* § 1.2108(b) ("Within a period specified by Public Notice and after the Commission by Public Notice announces that long-form applications have been accepted for filing, petitions to deny such applications may be filed. The period for filing petitions to deny shall be no more than ten (10) days. The appropriate licensing Bureau, within its discretion, may, in exigent circumstances, reduce this period of time to no less than five (5) days."). Although the time period for filing petitions to deny is ordinarily ten days, it may vary by auction. *See, e.g.,* WCS Auction Closes, Auction 14, Pub. Notice, 12 F.C.C.R. 21653, 21657 (Apr. 28, 1997) ("Within five business days after the [FCC] gives public notice that the ... Form 600s are acceptable for filing, petitions to deny may be filed."); LMDS Auction Closes, Auction 17, Pub. Notice, 13 F.C.C.R. 18217, 18217 (Mar. 26, 1998) (thirty days); C, D, E, and F Block Broadband PCS License Auction Closes, Auction 22, Pub. Notice, 14 F.C.C.R. 6688, 6693 (Apr. 20, 1999) (ten days); 929 and 931 MHz Paging Auction Closes, Auction 26, Pub. Notice, 15 F.C.C.R. 4858, 4864 (Mar. 6, 2000) (ten days); 39 GHz Band Auction Closes, Auction 30, Pub. Notice, 15 F.C.C.R. 13648, 13654 (May 10, 2000) (ten days).

23. 47 C.F.R. § 1.2108(d)(3).

24. *See* 47 U.S.C. § 402(b)(6).

25. 47 C.F.R. § 1.2110(m).

26. *See id.* § 1.41.

27. *See id.* § 1.2110(b)(1)(i) (requiring an applicant to include the assets and revenues of "its affiliates, its controlling interests, and the affiliates of the applicant's controlling interests"); *see id.* § 24.720 (aggregating the revenues of the applicant and its affiliates to determine small and very small business status).

28. *Id.* § 1.2110(b)(5)(i); *see also id.* § 1.2110(b)(5)(iii) (defining "identity of interest" as follows: "Affiliation can arise between or among two or more persons with an identity of interest, such as members of the same family or persons with common investments. In determining if the applicant controls or has the power to control a concern, persons with an identity of interest will be treated as though they were one person."); *id.* § 1.2110(b)(5)(iii)(A)-(B) (describing spousal and kinship affiliation rules).

cant.[29] *De jure* control is "evidenced by holdings of greater than 50 percent of the voting stock of a corporation, or in the case of a partnership, general partnership interests." [30]

■ *De facto* control is "determined on a case-by-case basis," [31] although the FCC has "established minimum requirements of actual control that must be demonstrated by an applicant seeking entrepreneurial eligibility and designated entity status." [32] In some cases, to evaluate the issue of *de facto* control, the FCC has applied the *Intermountain Microwave* test, which was originally developed to address the question of control for purposes of section 310(b) of the Communications Act of 1934.[33] This analytical framework necessitates consideration of the following six factors:

(1) Who controls daily operations?;

(2) Who is in charge of employment, supervision, and dismissal of personnel?;

(3) Does the licensee have unfettered use of all facilities and equipment?;

(4) Who is in charge of the payment of financing obligations, including expenses arising out of operating?;

(5) Who receives monies and profits from the operation of the facilities?; and

(6) Who determines and carries out the policy decisions, including preparing and filing applications with the Commission.[34]

Application of the *Intermountain Microwave* test is not mandatory; the issue of *de facto* control is properly decided based upon a totality of the circumstances presented by each case.[35]

29. *See id.* § 1.2110(c)(2).

30. *Id.* § 1.2110(c)(2)(i).

31. *Id.*

32. *Applications of Ala. Native Wireless, L.L.C.,* Order, 17 F.C.C.R. 4231, 4238 (2002); *see also* 47 C.F.R. § 1.2110(c)(2)(i)(A)-(C) ("An entity must disclose its equity interest and demonstrate at least the following indicia of control to establish that it retains de facto control of the applicant: (A) The entity constitutes or appoints more than 50 percent of the board of directors or management committee; (B) The entity has authority to appoint, promote, demote, and fire senior executives that control the day-to-day activities of the licensee; and (C) the entity plays an integral role in management decisions.").

33. *See Intermountain Microwave,* Pub. Notice, 12 F.C.C.2d 559, 559 (1963); *Baker Creek Communications, L.P.,* Memorandum Opinion and Order, 13 F.C.C.R. 18709, 18714 (1998) (applying the *Intermountain Microwave* test in a case involving a challenge to a Local Multipoint Distribution Service long-form application filed by Baker Creek Communications, L.P., the recipient of various licenses and a bidding credit).

34. *Baker Creek Communications, L.P.,* 13 F.C.C.R. at 18714.

35. Interestingly, for the limited purposes of assessing *de facto* control in the context of spectrum leasing arrangements, the FCC has recently suggested that the *Intermountain Microwave* (facilities-based) standard is "outdated" and "out of step" and should be replaced by a more "refined standard that better accords with our contemporary market-oriented spectrum policies, fast-changing consumer demands, and technological advances." *Promoting Efficient Use of Spectrum Through Elimination of Barriers to the Development of Secondary Markets,* Report and Order and Further Notice of Proposed Rulemaking, 18 F.C.C.R. 20604, 20608, 206034 (2003).

However, the FCC has, for now, retained the *Intermountain Microwave* and other facilities-based analyses to decide "designated entity and entrepreneur eligibility issues." *Promoting Efficient Use of Spectrum Through Elimination of Barriers to the Development of Secondary Markets,* Second Report and Order, Order on Reconsideration, and Second Further Notice of Proposed Rulemaking, 2004 WL 1948477, ¶¶ 83–84 (F.C.C. Sept.2, 2004) ("[W]e decline to extend the revised de facto transfer standard applicable to spectrum leasing arrangements to other types of arrange-

### 3. Lack of Candor

▮▮ Applicants seeking licenses from the FCC have a "duty of candor," or an affirmative duty to fully and truthfully disclose information required in their submissions.[36] Conversely, lack of candor is "a concealment, evasion, or other failure to be fully informative, accompanied by an intent to deceive."[37] Lack of candor takes two forms: "(1) misrepresentation, which involves false statements of fact; and, (2) failure to disclose, which involves concealment, evasion, or other failures to be fully informative."[38]

## II. APPLICABLE LAW

▮▮ "Primary jurisdiction" is a longstanding judicial doctrine allowing for the referral of "a matter extending beyond the conventional experiences of judges or falling within the realm of administrative discretion to an administrative agency with more specialized experience, expertise, and insight."[39] This doctrine, which is "relatively narrow [in] scope," was designed to promote the proper relationship between administrative agencies and courts in service of two principal interests.[40] *First*, primary jurisdiction promotes "'consistency and uniformity in the regulation of an area which Congress has entrusted to a federal agency.'"[41] *Second*, it enables "'resolution of technical questions of facts through the agency's specialized expertise, prior to judicial consideration of the legal claims.'"[42] An additional consideration involves an evaluation of whether the doctrine advances judicial economy.[43] "Refer-

---

ments outside the context of spectrum leasing. Although commenters supported applying the revised standard more broadly, there are significant legal and practical difficulties that commenters have failed to address.... [W]e are concerned that revising our rules in these areas may cause a host of unintended consequences or ambiguities.").

**36.** *See, e.g., Marc Sobel,* Decision, 17 F.C.C.R. 1872, 1891 (2002).

**37.** *Application of Discussion Radio, Inc. WDIS(am), Norfolk, Mass.,* Memorandum Opinion and Order and Notice of Apparent Liability, 19 F.C.C.R. 7433, 7435 (2004).

**38.** *Applications of Metacomm Cellular Partners,* Order, 13 F.C.C.R. 12192, 12201 (1998) (quotation marks and citation omitted).

**39.** *LO/AD Communications, B.V.I., Ltd. v. MCI Worldcom,* No. 00 Civ. 3594, 2001 WL 64741, at *2 (S.D.N.Y. Jan.24, 2001) (quotation marks and citation omitted); *see also Tassy v. Brunswick Hosp. Ctr., Inc.,* 296 F.3d 65, 67 (2d Cir.2002) (tracing the origins of this doctrine to Justice Edward White's opinion for the Court in *Texas & Pacific Railway Co. v. Abilene Cotton Oil Co.,* 204 U.S. 426, 27 S.Ct. 350, 51 L.Ed. 553 (1907)). I note that the use of the label "primary jurisdiction" is, as the Second Circuit has noted, "singularly infelicitous" as it "does not mean that the district

court lacks *jurisdiction* over the dispute." *MFS Sec. Corp. v. New York Stock Exch.,* 277 F.3d 613, 621 (2d Cir.2002), *cert. denied,* 536 U.S. 924, 122 S.Ct. 2592, 153 L.Ed.2d 781 (2002); *see also Taylor,* 2004 WL 1719357, at *11 n. 114. Indeed, "primary jurisdiction is neither jurisdictional nor primary." *MFS Sec.,* 277 F.3d at 622.

**40.** *Goya Foods, Inc. v. Tropicana Prods., Inc.,* 846 F.2d 848, 851 (2d Cir.1988); *see TCG N.Y., Inc. v. City of White Plains,* 305 F.3d 67, 74 (2d Cir.2002), *cert. denied,* 538 U.S. 923, 123 S.Ct. 1582, 155 L.Ed.2d 314 (2003); *Voicestream Wireless Corp. v. All U.S. Communications,* 149 F.Supp.2d 29, 34 (S.D.N.Y.2001).

**41.** *TCG N.Y.,* 305 F.3d at 74 (quoting *Golden Hill Paugussett Tribe of Indians v. Weicker,* 39 F.3d 51, 59 (2d Cir.1994)).

**42.** *Id.* (quoting *Golden Hill Paugussett Tribe of Indians,* 39 F.3d at 59); *see also Tassy,* 296 F.3d at 68 ("As the origin and evolution of the primary jurisdiction doctrine demonstrate, the reasons for its existence and the purposes it serves are twofold: the desire for uniformity and the reliance on administrative expertise.").

**43.** *See TCG N.Y.,* 305 F.3d at 74. Interestingly, in *Tassy,* the Second Circuit specifically rejected the inclusion of "judicial economy"

ral is appropriate 'even though the facts after they have been appraised by such specialized competence [will] serve as a premise for legal consequences to be judicially defined." ' [44]

■■■ There is no fixed formula by which courts decide the applicability of the doctrine. To the contrary, in "every case the question is whether the reasons for the existence of the doctrine are present and whether the purposes it serves will be aided by its application in the particular litigation." [45] There are, however, four factors that courts in this Circuit have used to guide the analysis, asking whether:

(1) the question at issue is within the conventional expertise of judges or whether it involves technical or policy considerations within the agency's particular field of expertise;

(2) ... the question at issue is particularly within the agency's discretion;

(3) ... there exists a substantial danger of inconsistent rulings; and

(4) ... a prior application to the agency has been made. [46]

Courts must also consider the "fair administration of justice" by balancing the advantages of applying the doctrine against the potential costs associated with "complications and delay in the proceedings." [47] Finally, it should also be noted that federal courts have a "virtually unflagging obligation ... to exercise the jurisdiction given them." [48]

## III. DISCUSSION

### A. The Wright Affidavit

■■■ As a preliminary matter, Taylor argues that this Court should disregard, or accord little weight to, the affidavit of former FCC general counsel Christopher J. Wright, offered by defendants in support of their motion for a stay. [49] Taylor's principal objection is that

---

**44.** *VoiceStream Wireless,* 149 F.Supp.2d at 34 (quoting *Far E. Conference v. United States,* 342 U.S. 570, 574, 72 S.Ct. 492, 96 L.Ed. 576 (1952)).

**45.** *Tassy,* 296 F.3d at 68. The decision to grant or decline a stay on the basis of primary jurisdiction is thus "within the sound discretion of the court." *Syntek Semiconductor Co. v. Microchip Tech. Inc.,* 307 F.3d 775, 781 (9th Cir.2002).

**46.** *National Communications Ass'n v. Am. Tel. & Tel. Co.,* 46 F.3d 220, 222 (2d Cir.1995) (quotation marks and citation omitted).

**47.** *Id.* at 223.

**48.** *Colorado River Water Conservation Dist. v. United States,* 424 U.S. 800, 817, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976).

**49.** *See* Taylor's Memorandum of Law in Opposition to Defendants' Motion to Stay Pending Referral of Two Issues to the FCC ("Pl. Opp.") at 22. As a general matter, a court confronted with a motion to stay premised on

as a consideration relating to the applicability of the primary jurisdiction doctrine, arguing that "the Supreme Court has consistently held that there are only two purposes to consider ... uniformity and expertise." *Tassy,* 296 F.3d at 68 n. 2. The court added that it is not surprising that the Supreme Court has remained silent as to the "judicial economy" factor, despite "ample opportunity during the ninety-five years since it created the doctrine" to mention it. *Id.* at 69 n. 2. "No doubt the reason is that considerations of judicial economy cannot assist a primary jurisdiction analysis, as it will always be more economical, from a judge's point of view, to ... quickly refer it to an administrative agency, instead of adjudicating it himself. We are enjoined to resist this temptation...." *Id.*

Two months later, the Second Circuit observed that in addition to the two principal interests (consistency and expertise), it has "also cited judicial economy as an interest that the primary jurisdiction doctrine can serve." *TCG N.Y.,* 305 F.3d at 74. Accordingly, although the interests of judicial economy are likely served by a referral to the FCC, I accord this factor relatively little weight.

Wright, although qualified to offer an opinion regarding the issues involved in this case, cannot be considered the primary author of the affidavit. Rather, Taylor claims that: (1) the initial "outline" of the document was provided by defendants' counsel, (2) most of the work in preparing the affidavit was undertaken by two attorneys with Wright's law firm who lack FCC experience, and (3) extensive "review" of the document was then performed by attorneys for the defendants.[50] This "collaboration" allegedly resulted in a final product lacking the indicia of reliability.[51]

Having reviewed the affidavit in light of Taylor's allegations, there is no reason to disregard it altogether. *First*, although defendants' counsel suggested key topics for discussion and the order in which such issues could be addressed, there is no compelling reason to believe that the substantive information set forth therein was not Wright's opinion. It is unlikely that the description of the underlying policies of the auctions is based on anything other than Wright's own FCC experiences. *Second*, the hours spent by other attorneys in preparing the document do not appear unreasonable. *Third*, the revisions made to the document by attorneys for the defendants, while raising some questions, are not particularly substantive or surprising.

Accordingly, I will consider the affidavit, but will also weigh the concerns raised by Taylor.

## B. Primary Jurisdiction

Defendants seek referral to the FCC of two issues underlying Taylor's FCA allegations: (1) "whether the [d]efendant minority investors had *de facto* control over [d]efendant bidding entities[;] and (2) whether [d]efendants acted with a lack of candor towards the FCC by allegedly omitting information regarding the [d]efendant minority investors' relationships to the [d]efendant bidding entities."[52] Although defendants characterize the Complaint as "replete with references to [these] two key issues,"[53] the latter issue warrants only brief discussion. *First*, Taylor correctly notes that "lack of candor," which requires an "intent to deceive," is not an element of the claims asserted herein.[54] Indeed, "[f]or purposes of the FCA, 'knowing' and 'knowingly' do not require proof of a 'specific intent' to defraud."[55] *Second*, even if "lack of candor" was relevant to this action, whether defendants acted with a lack of candor is unquestionably within the conventional expertise of judges. A determination as to whether defendants acted with the requisite intent for a finding of liability under

---

the primary jurisdiction doctrine is permitted to consider affidavits in deciding the motion. *See, e.g., National Communications Ass'n*, 46 F.3d at 224 (taking into account affidavits submitted by the parties).

50. *See* Pl. Opp. at 22–23.

51. *See id.* at 23.

52. Defs. Mem. at 11.

53. *Id.*

54. *See* Pl. Opp. at 20; *see also Application of Discussion Radio, Inc. WDIS(am), Norfolk, Mass.*, 19 F.C.C.R. at 7435; Wright Aff. ¶ 40

("The [FCC] has defined 'lack of candor as concealment, evasion, or other failure to be fully informative, accompanied by an intent to deceive.' ").

55. *Taylor*, 2004 WL 1719357, at *9. "Knowing" and "knowingly" are given special meaning by the FCA as: "(1) ha[ving] actual knowledge of the information; (2) act[ing] in deliberate ignorance of the truth or falsity of the information; or (3) act [ing] in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b).

the Act does not require "technical," agency-specific expertise.

### 1. The FCA and Administrative Referral

 Cases brought pursuant to the Act under the so-called false "certification theory" of liability necessarily implicate, to some degree, agency knowledge.[56] This is particularly true where the gravamen of the Complaint is that defendants defrauded the Government by falsely certifying compliance with governing administrative regulations.[57] For that reason, the application of the primary jurisdiction doctrine in the context of the FCA presents a rather unique situation.

Perhaps acknowledging this interdependence, the FCA specifically authorizes the Government to require the resolution of FCA claims though administrative, rather than judicial, proceedings.[58] Accordingly, if the conflict between the regulatory agency and the judiciary is truly intractable, this statutory provision enables the Government to elect to have the agency decide the issue. Although defendants counter that Taylor has not "cited any case in which the Government filed a motion seeking an alternative administrative remedy rather than just declining to intervene," [59] this observation does not diminish the significance of this alternative. While the contention that the primary jurisdiction doctrine can *never* apply in FCA cases lacks persuasive force, the unusual circumstances presented by motions to stay pending referral in such actions warrant the exercise of caution in approaching this question.

In light of the foregoing, it is not surprising that courts generally decline to invoke this doctrine to defer to a federal agency, even where the FCA claims require interpretation of a regulatory scheme governed by an administrative agency.[60] Indeed, defendants cite only one case, *United States v. Dan Caputo Co.*, in which a federal appellate court has addressed primary jurisdiction in the context

---

**56.** *See, e.g., United States ex rel. Capella v. Norden Sys., Inc.*, No. 94 Civ.2063, 2000 WL 1336487, at *8 n. 7 (D.Conn. Aug. 14, 2000) (citing cases finding FCA liability for false certifications of compliance with the requirements of a Small Business Administration minority contracting program and the Fair Housing Act); *United States ex rel. Quinn v. Omnicare Inc.*, No. 03 Civ. 2187, 2004 WL 1933626, at *8–*9 (3d Cir. Sept.1, 2004) (considering relator's false certification theory premised on section 13:39–9.15(a)(2) of the New Jersey Administrative Code, Board of Pharmacy Regulations and the Medicaid rules).

**57.** For purposes of this motion, I consider this action as a "false certification" case. *See Taylor*, 2004 WL 1719357, at *9 n. 91 ("One commentator has broadly categorized FCA cases as: (1) mischarge, (2) fraud-in-the-inducement or false negotiation, (3) false certification, (4) substandard product or service, or (5) reverse false claim suits.... Although this action contains features common to both

category 2 and 3 cases, it is *most* akin to false certification cases ....") (citation omitted).

**58.** *See* 31 U.S.C. § 3730(c)(5).

**59.** Defendants' Reply Memorandum of Law in Further Support of Their Motion to Stay Pending Referral of Two Issues to the FCC ("Reply Mem.") at 2 (emphasis omitted). .

**60.** *See* Claire M. Sylvia, The False Claims Act: Fraud Against the Government § 10:13, at 474 (2004) ("Most courts that have considered the argument that a court should defer resolution of a False Claims Act case pending an agency's determination of one or more issues in the case have rejected it."); John T. Boese, 1 Civil False Claims and Qui Tam Actions § 5.06[B][3], at 5–78 (2d ed. & Supp.2002–2) (noting that although "a few courts have applied the primary jurisdiction doctrine and deferred to the governing agency in FCA cases requiring an interpretation of the Davis–Bacon Act provisions, most courts have not adopted this theory").

of the FCA.[61] But for the reasons that follow, this case neither requires, nor even strongly suggests, that a similar result is warranted here.

At issue in *Dan Caputo* was whether the Department of Labor ("DOL") should, in the first instance, evaluate whether the "steamfitter" classification covers the kind of pipe-laying work that relator claimed the workers performed, a question the DOL had never before considered. The district court in *Dan Caputo* issued a short order granting defendants' motion to dismiss the case pending referral to the DOL for a ruling as to whether the "defendants misclassified their employees for the purposes of the Davis–Bacon Act." [62] In a two-page opinion, the Ninth Circuit directed the district court to stay the action until the DOL decided the issue of how particular types of work should be classified.[63] The court noted, however, that deferral on the issue of whether the defendants misclassified their employees was inappropriate.[64]

In reaching its decision, the Ninth Circuit had the benefit of the Government's views, as expressed in an amicus brief. The Government stated: "The district court . . . did not err in staying its hand until [the DOL] resolves this specific issue, which may not be resolved or reviewed by the federal courts. The government wishes to make clear, however, the very limited scope that should be given to the court's ruling." [65] The Government further characterized the circumstances involved in *Dan Caputo* as "narrow," noting that "where a factual determination that is a predicate to [FCA] liability involves what would normally fall within the exclusive, nonreviewable jurisdiction of the [DOL]—the district court correctly concluded that the court should stay its hand until the Department had acted." [66] Unlike the question raised in *Dan Caputo*, the issue of whether the complained-of behavior violated the FCC's rules relating to *de facto* control is neither within the exclusive, nonreviewable jurisdiction of the FCC, nor is it a matter of first impression for the FCC. Accordingly, *Dan Caputo* does not, standing alone, compel this Court to refer the issue of *de facto* control to the FCC.

## 2. Primary Jurisdiction "Factors"

For the reasons set forth below, consideration of the factors that traditionally inform the court's decision of whether to invoke the primary jurisdiction doctrine is similarly unavailing for defendants.

### a. Is the Issue Within the Conventional Judicial Expertise or Does it Involve Technical or Policy Considerations Within the FCC's Expertise?

The question of whether the minority investors exercised *de facto* control over defendant bidders is within the conventional expertise of judges. Indeed, the facilities-based analyses, including the *Intermountain Microwave* test, closely mirror the familiar test used to assess corporate domination. For instance, when determin-

---

**61.** *See* Defs. Mem. at 21 (citing *Dan Caputo*, 152 F.3d 1060 (9th Cir.1998) (per curiam), *rev'g*, No. 95 Civ. 684, 1996 WL 400967 (N.D.Cal. July 3, 1996)); Reply Mem. at 3 (noting that *Dan Caputo* is the "only federal appellate case to decide a primary jurisdiction referral issue under the FCA").

**62.** *Dan Caputo*, 1996 WL 400967, at *1.

**63.** *See Dan Caputo*, 152 F.3d at 1062.

**64.** *See id.*

**65.** Brief of the United States as Amicus Curiae, No. 96 Civ. 16563, 1997 WL 33633546, at *9 (Sept. 15, 1997).

**66.** *Id.* at *14.

ing whether one entity is a mere alter ego or "shell" of another corporate entity or individual, courts have considered factors such as:

> (1) the absence of the formalities ... that are part and parcel of the corporate existence ..., (2) inadequate capitalization, (3) whether funds are put in and taken out of the corporation for personal rather than corporate purposes, (4) overlap in ownership, officers, directors, and personnel, (5) common office space, address and telephone numbers of corporate entities, (6) the amount of business discretion displayed by the allegedly dominated corporation, (7) whether the related corporations deal with the dominated corporation at arm's length, (8) whether the corporations are treated as independent profit centers, (9) the payment or guarantee of debts of the dominated corporation by other corporations in the group, and (10) whether the corporation in question had property that was used by [a related] corporation[ ] as if it were its own.[67]

But, defendants counter, resolution of the issue of *de facto* control requires the Commission's technical and policy expertise. In particular, defendants contend that courts regularly refer telecommunications-related issues to the FCC based on the Commission's "pervasive regulatory power" and because of its "extensive and spe-cialized body of rules." [68] Although the FCC's view on the issues presented herein could be useful, whether the minority investors exercised *de facto* control over defendant bidders is not a technical matter that necessitates recourse to the Commission. That this question does not require technical expertise is evident from the cases cited by defendants to illustrate the type of inquiries that have been referred to the FCC. For instance, courts have deferred to the FCC with respect to: (1) the technical aspects of voice grade 7 service provision, relating to the FCC's expertise "on matters such as circuit designs, signal transmissions, noise attenuation, and echo return loss"; [69] (2) the "adequacy of the necessary language to be included in tariff filings made by the [National Exchange Carrier Association, an entity specially formed by the FCC] under the FCC's direction"; [70] and (3) "the appropriate characterization of billing and collection in the area code 900 context." [71] The question of *de facto* control is easily distinguishable from these issues, which draw on the FCC's expertise in that it is neither technical nor dissimilar from matters routinely addressed by courts.

Moreover, *de facto* control regarding the defendants in this action fails to implicate the policy considerations contemplated by the primary jurisdiction doctrine. Unlike,

---

**67.** *Nuevo Mundo Holdings v. Pricewaterhouse Coopers LLP,* No. 03 Civ. 613, 2004 WL 112948, at *7 (S.D.N.Y. Jan.22, 2004) (citation omitted); *see also, e.g., JSC Foreign Econ. Ass'n Technostroyexport v. International Dev. & Trade Servs., Inc.,* 295 F.Supp.2d 366, 378 (S.D.N.Y.2003); *Miramax Film Corp. v. Abraham,* No. 01 Civ. 5202, 2003 WL 22832384, at *8 (S.D.N.Y. Nov.25, 2003); *Network Enters. v. APBA Offshore Prods., Inc.,* No. 01 Civ. 11765, 2002 WL 31050846, at *3 (S.D.N.Y. Sept.12, 2002).

**68.** Defs. Mem. at 10; Reply Mem. at 5–6.

**69.** *Access Telecomms. v. Southwestern Bell Tel. Co.,* 137 F.3d 605, 609 (8th Cir.1998), *cited in* Defs. Mem. at 10.

**70.** *National Communications Ass'n,* 46 F.3d at 224 (characterizing *Allnet Communication Serv., Inc. v. National Exch. Carrier Ass'n, Inc.,* 965 F.2d 1118, 1119 (D.C.Cir.1992)); *see also* Defs. Mem. at 10 (citing *Allnet Communication Serv.*).

**71.** *Mical Communications v. Sprint Telemedia,* 1 F.3d 1031, 1040 (10th Cir.1993), *cited in* Defs. Mem. at 10.

for instance, the "general application of a tariff,"[72] the determination of control is so factually driven that it impacts primarily, if not exclusively, the parties to the particular dispute.[73] Thus, this factor counsels against referral to the FCC.[74]

### b. Is There a Substantial Danger of Inconsistent Rulings?

Defendants assert that if this Court "decide[s] the *de facto* control and lack of candor issues without the benefit of prior agency adjudication, there is a significant risk of confusing the appropriate standards, disrupting the FCC's delicate regulatory scheme, and eroding the FCC's ability to monitor and administer its licensing process."[75] Defendants add that "[l]egal uncertainty and unpredictability on core issues will chill investment in wireless and other services regulated under the Communications Act and impede the FCC's duty to ensure the United States receives fair value for spectrum licenses."[76]

These arguments lack merit for at least two reasons. *First,* defendants repeatedly emphasize that the *de facto* control inquiry is factually intensive, based on a totality of circumstances.[77] Thus, applicants seeking to establish their entitlement to benefits earmarked for small businesses cannot blithely rely on "precedent," because the circumstances underlying their applications are unique. As a matter of logic, there is little danger of inconsistent rulings where the issue presented is a narrow factual dispute, *i.e.,* whether the minority

---

**72.** *National Communications Ass'n,* 46 F.3d at 224.

**73.** Defendants also submit that referral is "particularly important and appropriate when plaintiff alleges that a party misled an agency." Defs. Mem. at 10 (citing *Alberta Gas Chems. Ltd. v. Celanese Corp.,* 650 F.2d 9 (2d Cir.1981)). This contention appears to relate primarily to the lack of candor issue, which, as noted in the preceding section, need not be referred. Moreover, most false certification cases brought under the FCA involve allegations that a party somehow misled an agency by knowingly making (or causing to be made) a false statement to elicit a federal payment. But reflexively to refer the issue in every FCA case to the governing agency would run counter to the purpose of the Act— to provide a federal judicial remedy for this kind of mischief.

**74.** For many of the same reasons, the issues for which defendants seek referral are not "squarely placed within [the agency's] informed expert discretion." *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.,* 175 F.Supp.2d 593, 618 (S.D.N.Y.2001) (quotation marks and citation omitted). The FCC regularly addresses these issues, but federal courts also routinely contemplate questions of this nature.

**75.** Defs. Mem. at 19.

**76.** *Id.* Defendants rely solely on the Wright Affidavit in support of these arguments. Wright opines that "[a]llowing parties to circumvent ... established [FCC] precedent by taking issues of control and candor directly to court risks creating needless inconsistency and uncertainty that will chill investment in wireless services." Wright Aff. ¶ 45. Defendants also argue:

> [W]ith the designated entity rules being debated right now before the FCC and Auction 58 set to begin on January 12, 2005 ... there is a real and substantial possibility that a ruling on [FCA] liability by this Court, without first referring certain issues to the FCC for its consideration, could chill participation in the upcoming and subsequent auctions by creating uncertainty among potential designated entities and the investors that are necessary to support them.

8/26/04 Letter from Ethan M. Posner, counsel for defendants, except Mario Gabelli, to the Court. But, as Taylor points out, "[w]hatever rules the FCC adopts for Auction 58 ... do not bear on whether defendants falsely certified their qualification for 'designated entity' status in Auctions 5, 11, 14, 17, 22, 26, 30, and 33." 9/3/04 Letter from Paul B. Gaffney, counsel for Taylor, to the Court.

**77.** *See, e.g.,* Wright Aff. ¶ 33; Defs. Mem. at 6.

investors named in the Complaint exercised *de facto* control over defendant bidders for purposes of particular auctions. *Second*, the danger that any ruling by this Court under the FCA will "chill" participation in future auctions is *de minimus*. Taylor alleges that defendants knowingly ran afoul of FCC rules governing eligibility for bidding credits in a series of past auctions. The fact that the flagrant abuse of the competitive bidding system exposes responsible parties to liability under the FCA cannot be expected to discourage good faith participation in the process by bona fide "designated entities." In short, it is unlikely that efforts to remedy fraud knowingly perpetrated against the Government will "chill" participation in the public auctioning of spectrum licenses. Because there is no compelling reason that deferring to the FCC would promote uniformity or consistency, this factor weighs against referral.

### c. Was a Prior Application to the FCC Made?

The parties do not dispute that no prior application to the FCC has been made. Rather, as is permitted under the FCA, Taylor opted to pursue these claims on behalf of the Government through the federal judicial system, rather than the agency. As such, if this action were stayed, Taylor would have to petition the FCC, risking significant delay. Accordingly, this factor disfavors referral.

### d. Administration of Justice

It is well established that "[a]gency decisionmaking often takes a long time and the delay imposes enormous costs on individuals, society, and the legal system." [78] Relying on Wright's affidavit, defendants suggest that "the FCC has found that the great majority of *de facto* control and candor cases can be resolved on the basis of the record developed in the initial three pleading cycles and usually requires only a few months." [79] But the reliability of this statement is questionable in light of Wright's testimony that it can take the FCC more than eighteen months to decide matters of *de facto* control. [80] Given that Taylor has not initiated any proceedings before the FCC regarding the contested bidding credits, it is more likely than not that there will be some delay caused by a referral to the FCC. As such, the administration of justice weighs against application of the primary jurisdiction doctrine.

## IV. CONCLUSION

For the foregoing reasons, defendants' motion for a stay pending referral to the FCC is denied. The Clerk of the Court is directed to close this motion [Nos. 55 and 57 on the docket sheet]. A conference is scheduled in Courtroom 15C for September 27, 2004 at 4:30 p.m.

SO ORDERED.

---

**78.** *National Communications Ass'n,* 46 F.3d at 225 (quotation marks and citation omitted).

**79.** Defs. Mem. at 24 (citing Wright Aff. ¶ 28); *see also* 7/2/04 Deposition of Wright ("Wright Dep."), Ex. 9 to Manning Decl., at 57.

**80.** *See* Wright Dep. at 60, 69–70. Indeed, Wright points out that in one case (*Fox Television*), the FCC took thirteen months to reach a resolution. *See id.* at 59.